601 So.2d 700 (1992)
Michael Leroy MILLER and Donald Leroy Miller
v.
LOUISIANA GAS SERVICE COMPANY, et al., Louisiana Power & Light Company, and Zurich American Insurance Company.
No. 91-CA-890.
Court of Appeal of Louisiana, Fifth Circuit.
May 15, 1992.
Writ Denied September 25, 1992.
*701 Charles A. Verderame, New Orleans, for plaintiffs/appellees/cross-appellants.
John P. Manard, Jr., G. Bruce Parkerson, Phelps Dunbar, New Orleans, for defendant/appellee/cross appellant.
W. Malcolm Stevenson, Robert E. Rougelot, Nora F. McAlister, Monroe & Lemann, New Orleans, for defendant/appellant.
Steven Dow Oliver, Windhorst, Gaudry, Talley & Ranson, Harvey, for intervenor/appellant/cross appellee.
Before KLIEBERT, GRISBAUM and WICKER, JJ.
*702 WICKER, Judge.
Michael Leroy Miller and his father, Donald Leroy Miller, were both burned in a gas explosion while working to install a new gas main outside Hammond, Louisiana in Tangipahoa Parish. The Millers worked for Lloyd E. Joiner Construction Company under the latter's contract with Louisiana Gas Service Company (LGS). The Millers sued LGS and United Gas Pipeline Company, both owners and/or former owners of pipelines and gas mains in the area. The Millers joined Louisiana Power and Light Company (LP & L) as a defendant when they learned of that company's previous ownership of gas mains in the area. Zurich-American Insurance Companies intervened in the suit for repayment of worker's compensation benefits paid to the two men.
Following presentation of the Millers' evidence in a several-day bench trial, the judge dismissed United Gas from the suit. No one has appealed this dismissal. He ultimately rendered judgment in favor of the Millers and against LP & L. He also awarded Zurich its worker's compensation intervention.
LP & L has appealed the denial of its exception of prescription, the finding of liability on its part, certain remarks of the judge concerning pretermitted contractual claims between LP & L and LGS, and damages. LGS has appealed the damage award. The Millers have appealed the characterization of LGS as a statutory employer and the denial of their other theories of recovery against LGS. They also asked that judgment in favor of Zurich be amended to reflect its entitlement to payments made since the date of trial and to specify that Zurich's recovery be made only out of funds actually awarded to them. Zurich appeals the absence of an award for interest and for worker's compensation paid between the date of trial and a final judgment in these proceedings. We affirm in part, amend in part, and render.
Both United Gas and LP & L had gas mains in and around Hammond in the fifties. In 1955 LP & L approved the addition of a new gas main along Highway 51 to service customers along this route, including Oliver Treated Lumber Company. (Although the witnesses and parties refer to this gas main by various names, for simplicity we will refer to it as the Oliver main.) This main was in service by 1956. However, it apparently was tied into a United Gas main without the knowledge or consent of United Gas.
In the meantime the U.S. Securities and Exchange Commission ordered LP & L to divest itself of all its gas operations. LP & L created LGS by incorporation; and LGS entered into a purchase agreement for LP & L's water and gas facilities. The actual sale took place on September 30, 1958. At this point LP & L owned LGS stock, and LGS's first board of directors were former LP & L directors. LP & L divested itself of LGS stock in October of 1960.
LP & L had in 1956 created a system-wide map of all its gas lines in the area, but the map inadvertently omitted the Oliver main. A file card (mains card), however, was prepared showing the existence of the Oliver main and placed in LP & L's file in 1956. United Gas also began a system-wide map of its gas facilities at the same time; but, since it was not aware that the Oliver main was tied into its other lines, that main was also omitted from the United Gas map.
United Gas added a new main in 1966 and also sold some of its facilities to LGS in 1966, including the new main. In that year LGS prepared new mains cards for the Oliver main and the new United Gas main, and both these cards were put in the mains card file. LGS prepared a new mains card in 1978 to replace these two old ones; but the new mains card omitted the Oliver main.
The former United Gas main had begun to leak by 1983, so LGS prepared a work order to Joiner, the Millers' employer, to replace it. The work papers (job folder) included a diagram of what purported to be all the gas lines in the area, but the Oliver main was not included. Gas flow to the old United Gas and adjacent mains was cut off so that the men could cut out the old line and lay a new one alongside. When the gas flow was restarted on June 22, 1983, it *703 came through the overlooked Oliver main into the cut out section, where it was ignited by the torches the Millers were using. Because Michael Miller was standing in front of his father, he bore the brunt of the explosion.
The judge awarded Michael Miller a total of $900,000.00, plus interest, and Donald Miller a total of $7,963.70, plus interest. He awarded Zurich $105,873.59 and $292.48 for each of the two plaintiffs, less an amount for the Millers' attorneys fees and costs to be determined at a later hearing. He dismissed the tort claim against LGS and ruled in the Millers' favor on the prescription issue. He reasoned in part:
The Court finds that Louisiana Power and Light's exception of prescription should be overruled, under the legal theory of contra non valentum agere nulla currit praescriptio. Contra non valentum is applicable here because it was impossible for the plaintiffs to discover that Louisiana Power and Light Company had previously owned the line until the plaintiffs engaged in extensive discovery. The co-defendants answers to discovery uncovered this fact. Louisiana Gas Company had to do extensive discovery regarding the origin of the line and why this line was not on their cards. Even after discovering that Louisiana Power and Light Company built the line, the plaintiffs still didn't find out until later that Louisiana Power and Light had provided erroneous maps.
Louisiana law holds that prescription does not run against one who cannot ascertain the facts on which to base his claim....
....
The Court finds that several Louisiana Power and Light documents were incomplete and in error as of 1958 when Louisiana Power and Light sold this line to Louisiana Gas and at the time of the fire. These were serious errors and omissions without any warnings disclaimers or cross references on the mains cards to alert subsequent draftsmen....
....
The Court has no doubt that the faulty record keeping on the part of defendants, Louisiana Power and Light and Louisiana Gas Company caused this accident and the plaintiffs injuries.... The accident would not have happened had Lloyd E. Joiner personally known of the [Oliver] line.

PRESCRIPTION
The explosion which injured Mr. Miller took place on June 22, 1983; and Miller sued LGS and United Gas on November 4, 1983. At that time no one was aware that the exploding main was tied into a United Gas main by LP & L almost thirty years earlier. Right after the explosion LGS began a search for information about how the accident could have happened. Ultimately, the Millers learned through discovery of the old main and supplemented their petition to add LP & L as a defendant on September 18, 1984.
LP & L filed an exception of prescription on the grounds that the one year period for bringing suit had passed. The judge overruled the exception, finding contra non valentum applicable.
Louisiana law holds that prescription does not run against one who cannot ascertain the facts on which to base his claim. In accordance with Louisiana jurisprudence, this Court holds that the plaintiffs' claim against Louisiana Power and Light did not prescribe. Jordan v. Employee Transfer Corporation, 509 So.2d 420 (La.S.Ct., 1987), McClendon v. State, through the Department of Corrections, 357 So.2d 1218 (La.App. 1st Cir., 1978).
We agree. The Millers sent requests for production of documents to United Gas and LGS in January 1984. In April of that year they sent a set of interrogatories to LGS, and in May they sent another request for production of documents to United Gas. None of the responses indicated an involvement by LP & L. The deposition of Marsha Delaune Barber, a draftsman for LGS, reveals that the Millers were not provided with LGS's job folder until October 3, 1984. *704 Prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Prescription should not be used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage. On the other hand, a plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury.
When prescription begins to run depends on the reasonableness of a plaintiff's action or inaction....
Jordan v. Employee Transfer Corp., supra at 423.
There were no unnecessary discovery delays, in light of the complexity and difficulty of discerning responsibility for the Oliver main and for its omission from LGS's mains cards and system maps.
LP & L's argument concerning solidary obligors is not relevant, because the Millers do not rely on the principles of solidary obligation to defeat prescription.
We do not believe the judge erred in overruling the exception of prescription, and we affirm his judgment in this regard.

LP & L's LIABILITY
LP & L sold its gas facilities to LGS in 1958 and, at that time, transferred its records and many of its employees to LGS. LGS was not aware of the old Oliver line until after it conducted "extensive investigation" following the fire. The judge heard three days of testimony and concluded that LP & L's documents were incomplete and erroneous and that the error was a legal cause of the explosion. We believe the evidence supports the judge's factual conclusion.
Rene Gandolfo was a draftsman with LP & L since 1952 and with LGS since 1958. He testified that, at the time of the explosion, LGS was not aware of the Oliver line. He explained that the entire gas system was mapped in detail on a system of thousands of index cards called "mains cards", generally one for each block. In addition, there is a system map of the entire system which is accurate but has less detail than the mains cards.
He discovered, after investigation, that there was a mains card for the Oliver line when it was added in 1955. When a new facility was added later, that facility was not added to the mains card for that block but a new card was made that showed the new main but not the Oliver main. Mr. Gandolfo explained that this was not good drafting practice, especially since there was no notation on either card to indicate its incompleteness. To compound the error, the Oliver main never showed up on LP & L's system map. These errors were present in the records LP & L turned over to LGS.
As revisions were made over the years, other draftsmen perpetuated the error. Mr. Gandolfo testified that the people who redrew the mains cards in 1966 were probably misled by a bunch of conflicting drawings and maps; and he conceded that ideally both mains should have been shown, assuming both old cards were in the file when the draftsmen redrew them. One card, not three or four, for each area is the correct practice. Ultimately, the one mains card which showed the Oliver line was put into storage where it was located after the fire.
Enos Jack Bailey, who was a construction superintendent in charge of the job in 1983, testified that the jobs folder [the complete file of information for the contractor] was in error and the sketches were incorrect because they failed to show the Oliver line.
Thomas Brown, United Gas' district manager, testified that there was nothing in his records about the Oliver line and no indication that LP & L had ever requested permission to tie in to United Gas facilities.
Leon Waguespack, an engineer supervisor at New Orleans Public Service Inc., testified that mains cards should accurately reflect all the gas facilities covered by that card. New facilities should be added to existing mains cards; when a new mains card is made, it should show the old facilities and any new facilities that have been added. Then the old card is normally marked superseded and filed away. If, *705 however, a card is incomplete, it should have some sort of written notation to that effect to warn subsequent draftsmen. He noted that putting all facilities on one card or map, or cross-referencing them, is expected, accepted, good engineering and drafting practice. He would expect and assume these standards to have been used. However, he personally would have looked at nearby mains cards even if they had not been cross-referenced to be sure he had all the available information. When cards are superseded, they would be marked and filed in a separate location from the active cards.
Ms. Barber testified that she looked at the system maps and the mains cards to prepare the construction sketch. The system map of the time did not show both mains and she has since corrected it. She also testified that she would have expected the system map to show both mains even if it was not as detailed as a mains card. Ms. Barber also testified that she was asked, after the explosion, to look for documents as a result of a request from the attorneys. One of the documents she found was the old mains card showing the Oliver line.
Duty/risk analysis entails four inquiries: whether LP & L's failure to accurately map its gas system was a cause in fact of the gas explosion, whether it had a duty to protect the Millers from that explosion and resulting fire, whether LP & L breached that duty, and whether the Millers were injured as a result. See Mart v. Hill, 505 So.2d 1120 (La.1987). All inquiries should be answered "yes."
The Supreme Court has repeatedly held that "`[n]egligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm.'" Socorro v. City of New Orleans, 579 So.2d 931, 939 (La.1991), citing Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 482, 137 So.2d 298, 302 (La. 1962). Cause-in-fact is frequently reduced to a "but-for" test: would not plaintiff's injuries have occurred but for defendant's substandard conduct? Fowler v. Roberts, 556 So.2d 1 (La.1989). The Supreme Court has also recognized that there can be more than one cause-in-fact. Fowler, supra; Morris v. Orleans Parish School Bd., 553 So.2d 427 (La.1989).
Furthermore, with regard to any subsequent negligence on the part of LGS in not finding and correcting the erroneous documents,
Obviously, the defendant cannot be relieved from liability by the fact that the risk, or a substantial and important part of the risk, to which he has subjected the plaintiff has indeed come to pass. Foreseeable intervening forces are within the scope of the original risk, and hence of the defendant's negligence....
....
The risk created by the defendant may include the intervention of the foreseeable negligence of others.... The question is essentially one of the defendant's original obligation, and far removed from causation.
....
[O]rdinarily a defendant is not free to rely upon others to avert the danger which he creates.
W. Prosser, Law of Torts (4th ed. 1971) at 273-4, 288. A defendant whose negligent act is a cause-in-fact of injury is not necessarily insulated from liability by the intervening negligence of another. Such intervening negligence may need to be independent of the original negligence, Reeves v. Louisiana and Arkansas Ry. Co., 282 So.2d 503 (La.1973), or must supersede the original negligence, Mizell v. State, through La. Dept. of Hwys., 398 So.2d 1136 (La.App. 1st Cir.1980). Mere passage of even great periods of time between a cause-in-fact and resultant injury is not sufficient to cut off liability. In Winterrowd v. Travelers Indem. Co., 462 So.2d 639 (La.1985), sixty-nine years elapsed between the original manufacture of the punch press and the suit for injury; and sales, resales and modifications took place. Nevertheless, the court held the original manufacturer liable.
LP & L is not relieved of liability unless LGS's actions superseded LP & L's negligence and alone produced the injury. If LP & L could foresee or should have foreseen *706 that a gas explosion or other accident might occur because of its failure to properly map the system, then it is liable notwithstanding an intervening cause. See Domingue v. State Dept. of Public Safety, 490 So.2d 772 (La.App. 3rd Cir.1986).
We see no error in the trial judge's conclusion that a legal cause of this accident was the failure of LP & L to turn over to LGS complete, accurate records of its gas facilities. The fact that LGS failed to discover the error and correct it does not relieve LP & L of liability for the initial error.
We also find no abuse of the judge's discretion in admitting into evidence certain drawings prepared of the facilities at the time of the sale from LP & L to LGS.

THE CONTRACT BETWEEN LP & L AND LGS
The contract of sale between LP & L & LGS contained language by which LGS assumed certain obligations of LP & L. The Millers sought recovery against LGS, alternately, on a theory that LGS in its contract with LP & L had assumed all LP & L's tort liabilities. The judge disagreed. He had already found LGS to be the Millers' statutory employer, a finding with which we agree. Thus, he ruled that "tort and contract claims against a statutory employer are barred by the provisions of the Workers' Compensation Act." He cited this circuit's case of Braud v. Dixie Machine Welding and Metal Works, 423 So.2d 1243 (La.App.1982), writs denied 430 So.2d 77 & 78 (La.1983). Furthermore, he "believe[d] that this contract envisioned non tort situations such as indemnity for commercial issues like service contracts and land title disputes rather than indemnity for tort liability."
The Millers argue that LGS's statutory employer status does not insulate it from liability because it contractually assumed liability for LP & L's torts. LP & L also complains of this ruling, alleging that the judge wrongly decided contractual claims between LGS and LP & L despite his agreement to sever and defer trial on this issue.
The judge was correct in ruling that the Millers' exclusive remedy against LGS is in worker's compensation. La.R.S. 23:1032. This circuit has already ruled that injured workers cannot assert rights under indemnity contracts to which they are not parties. Braud v. Dixie Machine Welding and Metal Works, supra. The Millers are not entitled to judgment against LGS.
The respective rights and obligations, however, between LGS and LP & L have been severed for trial at another time. We amend the judgment to make clear that the ruling of the judge with regard to LGS's liability to the Millers under the contract does not extend to deciding the issues remaining between LGS and LP & L. Any determination that the contract between LP & L and LGS contemplated an assumption of tort liability by LGS is left for another trial.

DAMAGES
Only Michael Miller's damage award has been appealed. The judge awarded him a total of $900,000.00, broken down into $448,391.72 for past, present and future pain and suffering, and residual disability and scarring; $51,608.28 for past medical expenses; $100,000.00 for future medical expenses; $100,000.00 for past lost wages; and $200,000.00 for future loss of future earning capacity. The award for past medical expenses, which have been paid by the worker's compensation carrier, Zurich-American, has not been appealed.
Michael Miller was transported by car to Seventh Ward Hospital right after the accident. There he was given emergency care and then air-lifted to Baton Rouge General Hospital's burn unit.
Perry L. Chesney, M.D. was his doctor and testified at trial. He found Mr. Miller had second degree burns to the face and neck and third degree burns to the arms. He also had burns on his back and scattered areas on his legs. Thirty-five percent of his body was burned. Mr. Miller was in the hospital from June 22 until July 18, 1983. Daily treatment, sometimes twice daily, consisted of soaking in a weak Clorox solution, stripping off the bandages, and scrubbing the burns. Mr. Miller had *707 surgery on his arms (escharotomy) to release scar tissue and relieve pressure in the arms caused by a circumferential burn of the arms. Dr. Chesney also performed two skin grafting procedures as well as debridement of the burned areas. Mr. Miller was given medication for pain, including Demerol.
Dr. Chesney testified that the treatment was very painful. Mr. Miller wore a Jobst suit (a skin-tight elastic covering for his face, body, and arms) and was referred for physical therapy. The physical therapy was to prevent contractures of the elbows and was uncomfortable. Mr. Miller had a full range of motion and no contractures when he left the hospital. At the last visit there was no possibility Mr. Miller could return to his former work; however, Dr. Chesney doesn't know what recovery he might have made since then. Even if the contractures Mr. Miller developed had been successfully released surgically, they could still develop again, causing the range of motion to diminish.
William J. Kelley, M.D. saw Mr. Miller on August 18, 1983, in the Seventh Ward Hospital emergency room because of a tear in the scar sustained during physical therapy. He sutured and dressed the wound. He diagnosed Mr. Miller as having third degree and very deep second degree burns on the hands, neck, face, and trunk. He also found a lot of blotchy areas from where the skin grafts had been taken. He sent Mr. Miller back to physical therapy, although the physical therapist told him Mr. Miller wasn't progressing too well. Dr. Kelley also stressed to Mr. Miller that any malingering would interfere with the doctor/patient relationship.
On September 15, 1983, Dr. Kelley did surgery to release the burn scar of the right elbow and did additional skin grafting. Mr. Miller was in the hospital five days this time. Dr. Kelley sent Mr. Miller to a new physical therapist, who reported that he was doing well, had a good attitude, and was making excellent progress. On January 5, 1984, Dr. Kelley performed the same surgery on the other elbow, for a two-day hospitalization. He believed that Mr. Miller would not need additional surgery. At he time of his discharge from treatment in June of 1984, he had one hundred percent range of motion and was still going to physical therapy. Mr. Miller was released from physical therapy a couple of days later.
Dr. Kelley testified that generally a patient would have kept working at home on physical therapy because he could regress if he sat around all day doing nothing. He believed that, as of June 1984, Mr. Miller's arms were functioning as well as they were before they were burned. He felt the scar tissue was not as elastic as normal skin but was no more susceptible to tearing. The skin might possibly be hypersensitive, but Dr. Kelley wouldn't expect it. He wouldn't have put any restrictions on Mr. Miller's employment.
Randolph M. Howes, M.D., a plastic surgeon, saw Mr. Miller only once, in February of 1991, for evaluation. He had not seen any of his medical records. At that time Mr. Miller complained of skin sensitivity and breaking down, itching, bowstringing of the left elbow, and difficulty extending his arms. Mr. Miller had scars or hyperpigmentation of the left nostril, neck, chest, abdomen, sides, back, and legs. He found that the range of motion was adequate in these areas and that the itching could be adequately treated with medicated creams.
The arms, however, had severe hyper and hypopigmented areas of hypertrophic scars, scar contractures, considerable deformity, and tenderness. Mr. Miller had a ten percent restriction of full extension and the same amount on overhead extension. He had full flexion but "bowstringing", i.e. tight skin, in the elbow area. Dr. Howes felt this condition could likely be alleviated with surgery. Mr. Miller's main complaint was heat intolerance.
Dr. Howes recommended restrictions: not to traumatize the skin grafts by hitting, abrasion, bumps, rubbing, or friction. He found no areas of skin breakdown at the time of the examination and couldn't judge how easily the skin would break down. Lifting could be a problem but he *708 would leave it to Mr. Miller to decide how much he could lift comfortably. If Mr. Miller were to complain of soreness on lifting more than twenty five pounds, this could indicate he is lifting too much or that he hasn't done anything in a long time. Dr. Howes would restrict Mr. Miller's employment but hadn't enough information to know whether he would restrict him from working altogether.
With regard to future surgery, Dr. Howes testified: he "may consider doing more releases of scar contractures of the arms." He couldn't say with probability that Mr. Miller would need this surgery. If the need did arise, however, Mr. Miller would need the surgery to take care of normal routine functioning. "You're never going to return this man's arms to normal," he testified. Pressed to testify concerning whether future surgery was more probable than not, Dr. Howes stated, "If he does not have breakdown of these hypertrophic scars which can occur, if he does not need that additional ten percent of extension or such, perhaps he will not need future surgery." He recommended that Mr. Miller see a physical therapist and work toward getting as back to normal as possible. He did note that the surgery he contemplates to correct the aesthetics would be difficult and long, if at all possible. He thought perhaps some of the scars could be decreased and some of the additional contractures released. This would involve multiple surgeries, at least ten, requiring grafting.
Mr. Miller's complaints of being weaker; of having cold, hard, purplish arms in cold weather; and of itching, redness and tingling in the sun are consistent with his injury, according to Dr. Howes. All these complaints are more probably than not related to his burns. Dr. Howes did admit that Mr. Miller might be able to recover his strength with exercise, but he would first have to be evaluated to determine the extent of his functional loss. If Mr. Miller's loss of strength is due to disuse, then he probably could contemplate full recovery with rehabilitation. However, if the loss of strength is due to the burns, then one hundred percent recovery is not probable.
Michael Miller testified that he went through the tenth grade in school and failed after that. His first job was making pallets at minimum wage. He then went to work for Joiner making $5.00 per hour, working forty hours per week with a couple of hours of overtime each week. He had been working for just a few months and was eighteen years old when he was injured.
He testified the pain was indescribable. Every day in the hospital they tore his bandages off and scrubbed his wounds with a bristle brush. The pain medication they gave him was not enough to stop the pain, so he would scream, and cry, and holler.
At one point the worker's compensation checks stopped coming, and he had to try to find work even though his condition was unchanged since the initial healing.
Mr. Miller complained that his arms itch and don't sweat; that his underarms sweat continuously; that he needs special shirts, soap and lotion; that he cannot go in the sun; that heat makes his skin feel like it's burning; that the donor sites also itch; that his arms turn purple and hard in the winter; and that he is sometimes numb in the arms. He confines his fishing and hunting trips to the early morning or late evening to avoid the sun and heat, and his gun gets heavy and hard to carry. When he tries to work, he has trouble bending his thumb, it's hard to stretch his arms over his head, the skin pulls on his arms, and his arms are not as strong as they once were. He swims only at night and with a long-sleeved shirt to cover his scars. His daughter has noticed his scars and refers to them as "Daddy's bobo." His skin also splits open easily and is tender and slow-healing.
Mr. Miller did admit that he has not tried to find a job where he could alternately sit and stand and lift no more than twenty-five pounds. He was willing to try if such a job were available. He hasn't tried to find a job because he didn't think he had to. He also admitted that, except for seeing Dr. Howes prior to trial and another doctor *709 once for hives, he hadn't seen or needed to see a doctor for six-and-one half years.
In addition to his testimony, Mr. Miller had photographs of his injuries and showed his scars to the judge in chambers.
Marie Miller, Mr. Miller's wife, testified that he had had three jobs since his accident: Asplundh Tree Company, R & S Metal Builders, and Crest Meat Company. He quit Asplundh after one month because he couldn't do the job. At R & S he carried tools and quit after a week. He drove a van for Crest Meat during two periods of employment, each for a few months. He quit because the work was too hard for him. Her husband took these jobs because he had been cut off worker's compensation earlier. One of the reasons he quit Crest Meat was that he had been told that he couldn't receive worker's compensation and also continue working. Mrs. Miller also testified that she, her parents, and her uncle helped support the family; and she also gets food stamps and a medical card.
Dr. Bobby Spencer Roberts, a nationally-certified vocational evaluation specialist, testified for Mr. Miller. His evaluation of Mr. Miller consisted of an interview and various tests of academic achievement, intellectual ability, vocational interest assessment, and functional tolerance. The academic achievement tests put Mr. Miller generally on the third or fourth grade level, depending on the test administered and the subject. His occupational interest was skilled technology and his highest ability was mechanical reasoning. Because of this injury early in his work life, Mr. Miller had no vocational skills to build on, although he did have basic aptitudes to build skills from. Dr. Roberts found some personality problems.
In his functional assessment of Mr. Miller, Dr. Roberts found problems with foot-eye coordination, difficulty standing and bending, pain in the lower back, and pain and pulling on reaching overhead. The second time these tests were administered, Mr. Miller performed somewhat better. Dr. Roberts concluded that Mr. Miller could do light work and sedentary work that was not highly manipulative. He also noted that Mr. Miller had environmental restrictions, such as sensitivity to sun, heat, and chemicals. He felt that Mr. Miller's capacity had not changed in six years and was not likely to change. He concluded that Mr. Miller was at a competitive disadvantage even for light and sedentary work because his vocational development was interrupted by the accident. Dr. Roberts believed that had Mr. Miller not been injured, he could have been a welder, a heavy equipment operator, a construction worker, a pipefitter, or a diesel mechanic, with hourly wages ranging from $7.00 to $14.00 per hour.
On cross examination Dr. Roberts admitted that he did not have Mr. Miller's medical reports or physical therapy reports. He recommended, following Mr. Miller's first visit, physical therapy, an evaluation and treatment plan, remedial education, occupational exploration, psychological evaluation, training, disability counseling, and occupational therapy. At Mr. Miller's second visit he hadn't done any of these things but he had tried to go back to work. Dr. Roberts also noted that Mr. Miller is educable mentally retarded and is locked into entry level positions.
Nancy Favaloro, a vocational rehabilitation counselor and job placement specialist, testified for the defendants. She is trained to interpret the reports of physical therapists, occupational therapists, and doctors; and she does job analysis. She reviewed Mr. Miller's medical information and Dr. Roberts' report. Then she had a vocational interview with Mr. Miller and administered an adult basic learning examination which placed Mr. Miller on the fourth or fifth grade level, depending on the subject. She found the only medical restriction to be avoidance of excessive sunlight, with lifting to be left to Mr. Miller's discretion.
Ms. Favaloro found Mr. Miller did have transferable skills, such as loading and unloading, reading work orders, following instructions, and working with his hands doing repetitive tasks. She felt he would be able to reenter the work force in an unskilled area in jobs such as bench worker, parts clerk, warehouse worker, janitorial *710 worker, security guard, or bridge operator. She testified that all of these jobs were available in Tangipahoa Parish. She believed that Mr. Miller could have found a job at minimum wage. Ms. Favaloro admitted that she hadn't asked Mr. Miller if he was interested in any of these jobs or administered an interest test. She also noted, however, that injured people often become better workers and have less absenteeism.
Mark Tubre, vice president of Crest Meat, testified that Mr. Miller was a good employee who worked consistently, including overtime. The payroll records bear this out. Mr. Tubre said Mr. Miller told him that his attorney told him to quit his job. He also noted that Mr. Miller never complained of pain in his arms.
Philip Clesi, an actuary with expertise in wage growth and projection, testified for Mr. Miller. He took into consideration Mr. Miller's pre-injury employment record of $5.00 per hour earnings as a laborer, forty hours a week with two hours overtime. Based upon this, he calculated Mr. Miller's past wage loss, after subtracting his actual wages from the date of the accident until the trial, as $77,761.00. However, applying an annual growth rate of 5.4% produced a projected annual income, as of the date of trial, of $17,154.00, for a loss of past income of $99,894.00.
Then Mr. Clesi calculated Mr. Miller's future loss, using a work life expectancy of 30.14 years and a life expectancy of 44.49 years. He also assumed and used a real wage growth rate of .97%, added to a 4.5% inflation rate, for a salary growth rate of 5.47%. He made three calculations of loss: using $5.00 per hour, $6.325 an hour, and $7.65 per hour. Using the lowest wage of $5.00, he projected Mr. Miller's loss of future earnings as $250,820.00. The other two calculations were $313,827.00 and $383,815.00. These figures included no offsets for any income Mr. Miller might actually make in the future and assumed an interest rate of 2.71%. This interest rate, added to an inflation assumption of 4.5%, produces a rate of return of 7.21%. He also used a discount rate of 1.74%. He further noted that his calculations do not take into consideration any ancillary benefits such as health insurance. He admitted on cross examination that the studies he used are not specifically related to Tangipahoa Parish and do not take into consideration Mr. Miller's academic and intellectual abilities or his work history.
Kenneth J. Boudreaux, a professor of economics and finance at Tulane University, testified for the defendants. He was qualified as an economist with expertise in wage growth and the discount rate. He reviewed Mr. Miller's demographic information, his post-accident earnings, and his wage rate at the time of his injury. Dr. Boudreaux assumed a work life expectancy of 36.15 years from the date of the accident, using a more up-to-date table than that used by Mr. Clesi. He assumed that Mr. Miller's full-time work at $5.00 per hour would have produced an annual income of $10,400.00. He also considered the existence of a major contraction in the construction industry. Using these figures, including a deduction for Mr. Miller's actual wages earned, he calculated the past wage loss as $71,850.00. However, if you assumed a minimum wage rate of $3.98 per hour, Mr. Miller's past loss was only $20,730.00. In calculating Mr. Miller's future losses, he assumed that Mr. Miller could continue to work at his pre-accident rate of $5.00 per hour and has suffered no loss of future earning capacity. Assuming that Mr. Miller had no employment possibility whatsoever, he would calculate his past loss at $177,351.00, with a range of $148,000.00 to $207,000.00. For the future, assuming total inability to work, and using a minimum wage of $4.25 to produce an annual income of $8,840.00, he testified that the present value of Mr. Miller's future loss would be $26,603.00. When Dr. Boudreaux used an 8% discount rate and a 4% increase, he would calculate Mr. Miller's future loss at between $22,000.00 and $31,000.00. He noted that there had been no discernable increase in hourly rates since 1982 or 83 and that there were fewer jobs available. These factors combined to lower actual incomes considered. On cross examination, however, he testified that using a *711 $.75 wage differential, a 5% wage growth figure, and a 7% discount rate, Mr. Miller's future loss would increase to $34,453.00.
Lloyd W. Joiner, a foreman at Lloyd E. Joiner Construction, testified that Donald Miller, the father, worked for Joiner until 1988 and was still making $5.00 per hour at that time. At the time of trial, Joiner's laborer's were still making $5.00 per hour, although some laborers work up to other positions such as welder at $10.00 per hour. He noted that there had been no wage rate increases for anyone in the last eight years.
We do not believe the judge was clearly wrong in his damage awards. The evidence reveals that Mr. Miller experienced intense pain and suffering for a time after his accident and still suffers a fair degree of disability. We have looked at the photographs of Mr. Miller, immediately after his burns, at the time of trial, and at intervals between the two extremes. The scarring and deformity of Mr. Miller's arms are truly disfiguring, and he continues to suffer disability and humiliation in his daily living. In making the award of $448,391.72 for pain and suffering, residual disability, and scarring, the judge noted, "a large amount of this award [the total of $900,000.00] is compensation for the excruciating pain and suffering the plaintiff experienced in conjunction with the various surgeries and skin grafts he has had to undergo." This award is not out of line with other burn injury awards. Toups v. Sears Roebuck & Company, 519 So.2d 842 (La. App. 4th Cir.1988); O'Brien v. Delta Gas, Inc., 426 So.2d 262 (La.App. 4th Cir.1983), writ denied 433 So.2d 163 (La.1983).
With regard to the award of $100,000.00 for past loss of wages, this is only $16.00 more than Mr. Clesi's calculation and within the judge's discretion to use the opinions of experts as a guide, but not a mandate, in fixing damages. The award of $200,000.00 for loss of future earning capacity is actually considerably less than Mr. Clesi's projections. There was ample evidence for the judge to conclude that, at the very least, Mr. Miller is and would remain at a competitive disadvantage in the job market. The judge noted that, "[e]mployment experts indicated that Michael Miller would be able to perform `light' work, but there are limited job opportunities in this area, and the plaintiff will certainly suffer a diminished earning capacity." We do not believe this conclusion is clearly wrong.
The award for future medical expenses, while high, is not so high as to constitute manifest error. Mr. Miller obviously suffers from the appearance of his body, as evidenced by his wearing a long-sleeved shirt to swim. The judge was not clearly wrong to conclude that, at some point, Mr. Miller would have the extensive, multiple surgeries referred to by Dr. Howes as necessary to improve his appearance. Based upon the cost of Mr. Miller's medical care so far of $51,608.72, we do not believe an award of $100,000.00 is speculative or out of line.
The decisions of the trier of fact with regard to the award of damages are entitled to great deference and should not be set aside unless they are clearly wrong. La. C.C. art. 1999; Reck v. Stevens, 373 So.2d 498 (La.1979). We do not find such clear wrongness here and decline to reverse or amend the judgment.

ZURICH AMERICAN'S INTERVENTION
Zurich American complains that its reimbursement for worker's compensation payments is limited to a dollar amount and does not recognize its entitlement to reimbursement for payments it will make up to the time this case is final. The Millers concede this argument. Zurich American also asks for an award of interest. We agree with both these contentions.
We therefore amend the judgment in favor of Zurich American to include any amounts paid by it until the judgment is final as well as interest. Brown v. DSI Transports, Inc., 496 So.2d 478 (La.App. 1st Cir.1986), writ denied 498 So.2d 18 (La.1986). This amount must be reduced by a pro-rata share of the Millers' attorney fees and costs, to be determined at a hearing. Moody v. Arabie, 498 So.2d 1081 (La. 1986). However, the amounts due Zurich American are payable only out of funds actually received by the Millers.

CONCLUSION
We affirm the judgment rendered in favor of Michael Leroy Miller and Donald *712 Leroy Miller in the amounts of $900,000.00 and $7,963.70 respectively, and against Louisiana Power and Light Company, including interest from the date of judicial demand and costs. We affirm the judgment dismissing Louisiana Gas Service Company on the basis of its status as the Millers' statutory employer. However, we amend the judgment to pretermit a ruling on any contractual claims between Louisiana Gas Service Company and Louisiana Power and Light Company. We amend and render judgment in favor of Zurich American Insurance Company and against Donald Leroy Miller and Michael Leroy Miller for any amount paid by it to or on behalf of the Millers under the worker's compensation act, including interest, such amounts to be payable out of the judgment actually received by Donald Leroy Miller and Michael Leroy Miller, subject to a credit for a pro rata share of the Millers' attorney fees and costs. Louisiana Power and Light Company must pay the cost of this appeal.
AFFIRMED IN PART, AMENDED IN PART, AND RENDERED.