**CROSBYTON SEED COMPANY, James G. Martin, D/B/A James G. Martin Brokerage, and Texas Seed Company, Inc., Appellants,**

v.

**MECHURA FARMS, Appellee.**

No. 13–92–553–CV.

Court of Appeals of Texas, Corpus Christi.

March 17, 1994.

Charles McGregor, Angela Tekell, Greg White, McGregor, White, Malesovas & Martin, Waco, James Munson, Wharton, for appellants.

Jade L. Hlavinka, William Watson, Jr., Houston, for appellee.

Before KENNEDY, DORSEY and BENAVIDES[1], JJ.

## OPINION

KENNEDY, Justice.

Mechura Farms[2] sued five companies for their roles in providing the Mechuras a grain sorghum seed that produced, in the Mechuras' view, a disappointing yield. The Mechuras settled before trial with two companies who provided chemicals to treat the seed, and recovered on some of their theories at trial against the remaining three companies, who produced and/or sold the seed. The court completely offset the jury's damage award against the settlement, but did not offset any of the attorneys' fees award against the remainder of the settlement proceeds.

The losing companies appeal by five points of error, assailing the charge, the sufficiency of the evidence to support the judgment, and the failure to offset the attorneys' fees. The Mechuras raise fifteen crosspoints, complaining about the court's granting of an instructed verdict against some claims and its denial, offset, or reduction of some elements of requested relief. We affirm in part, reverse and render in part, and reverse and remand in part.

The Mechuras alleged damages to their 1990 grain sorghum crop under theories including negligence, breach of contract, strict liability, violations of the Texas Deceptive

---

1. Assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to Tex. Gov't Code Ann. § 74.003 (Vernon 1988).

2. Mechura Farms is a partnership among Tommy Mechura; his brother, Ronnie; and their father, Rudy. The Mechuras have farmed for 20 years, 15 years, and 40 years, respectively.

Trade Practices Act, breach of express warranty, and breach of the implied warranties of merchantability and of fitness for a particular purpose. At the close of evidence in the three-week trial, the court granted the appellants' motion for instructed verdict against the causes of action for negligence, strict liability, breach of express warranty, and breach of the implied warranty of merchantability. The court denied the motion for instructed verdict on the other causes.

Because both sides launch evidentiary sufficiency attacks against the decisions on this motion that were unfavorable to them, we begin with a broad review of the evidence. We will leave the discussion of evidence relevant to specific causes of action until we address particular points of error.

In 1989, the Mechuras had one of their best years of grain sorghum production, averaging 5,264 pounds per acre. That year, the Mechuras used Texas Seed variety 466 (TS–466). On some fields, some of the newly emerged plants had a poor stand (number of plants per foot) of stunted and twisted, or buggywhipped, plants; buggywhipping occurs because chemicals deter the leaves of the emerging plants from unfurling. Pamela Younts, the marketing specialist for Matagorda County of chemical company Ciba–Geigy Corporation, took a seed sample from the Mechuras, but did not send it off for testing. She did not send it because Perry Cortese, Ciba–Geigy's representative for adjacent Wharton County, was sending off a sample of seeds from the Texas Department of Corrections farm that had produced plants with similar problems.

The test on Cortese's TDC sample showed that the seed suffered from an inadequate application of Concep II by the Crosbyton Seed Company. Concep II is a safener, a chemical applied to the seed to protect it from the herbicide metolachlor contained in Dual. Dual, which kills grasses, is found in Bicep, a combination herbicide which also contains Atrazine, a broadleaf weed killer. Bicep is often sprayed in bands on each side of the planter rows to kill plants which might otherwise compete with the grain sorghum for water and light. Since grain sorghum is a grass, sorghum seed planted in soil sprayed with Bicep needs to be protected from Dual by a safener like Concep. Cortese said the TDC crop also suffered damage from erratic application of Bicep, leading to damage from Atrazine, against which Concep II does not protect. He said that the Bicep misapplication problem was compounded by cool, moist conditions. Such conditions could cause the Atrazine to leach into the root zone of the developing sorghum and be absorbed into the plant. Younts never contacted the Mechuras with Cortese's test results because she felt that she and the Mechuras had resolved their dispute. She destroyed her 1989 sample from the Mechuras' farm.

In December 1989, Ron Kubecka, a Texas Seed representative, tried to sell the Mechuras some of his company's seed. The Mechuras declined to buy from Kubecka because they had already made an $8,000 downpayment with James G. Martin d/b/a James G. Martin Seed Brokerage. Kubecka and the Mechuras discussed the maturity rates of three or four varieties, including TS–466. Kubecka left a brochure which advertised TS–466 as a number one variety and gave a money-back guarantee.[3]

In early March 1990, the Mechuras negotiated with Martin over which varieties of seed to purchase. Martin confirmed that Tommy Mechura wanted four or five different varieties to spread the risk around. Martin said, however, that he had only TS–466 and Asgrow 712 available. Tommy Mechura testified that Martin said that TS–466 was an excellent seed, better than the other varieties he requested, and guaranteed it if the Mechuras had problems with it; there was no evidence of what form this "guarantee" took. Based half on his 1989 experience with TS–466 and half on the unavailability of other varieties, Tommy Mechura purchased 400

**3.** This guarantee proved to be limited to participants in a crop comparison program. Participants were required to plant small amounts of different varieties side-by-side under documented, identical treatment. If TS–466 did not perform as well, Texas Seed would refund the purchase cost of up to five bags. There is no evidence that the Mechuras ever asked or were told about this, or that they wanted to or did participate in the program.

bags of TS–466 with Concep II and Apron, an insecticide.

Texas Seed purchased the seed that went to the Mechuras from Crosbyton Seed Company, one of its suppliers. Texas Seed had received lot A9759A from Crosbyton, but returned it to Crosbyton for treatment with Concep II. Crosbyton purchased the Concep II, manufactured by Ciba–Geigy, from Terra International, Inc. Crosbyton treated and returned the seed, now renamed lot A9759AC, to Texas Seed, who sent it on to the Mechuras.[4] The seed bags bore a tag indicating that lot A9759AC had been tested in February 1990, showing 99% purity and an 85% germination rate. The standard germination test requires keeping four groups of 100 seeds in ideal germination conditions to see what percentage will sprout.

The Mechuras began planting their TS–466 on March 25. Two days later, after the Mechuras had planted more than 887 acres out of their 2,500, the area had heavy rains. The Mechuras recorded one and three-quarters inches on March 27, and one inch a week later. Some of the Mechuras' fields produced a thin stand with some weak, twisted, visibly damaged plants. The Mechuras' crop insurance adjuster, George Patterson, said he had no doubt that excess moisture caused the plant problems. Patterson was working with an insurance form that did not contain a box for chemical damage as a cause for recovery. He compensated the Mechuras for some of the replanting costs. The Mechuras bought 136 more bags of TS–466 from Martin at half-price to finish the replanting; Texas Seed's half-price deal for replant seeds applied only to purchases of replacement Texas Seed products and could not have applied to purchase of other seeds. They also bought 50 bags of Asgrow 712 from Martin, as well as 18 bags of Conlee Rustler from someone else.

The Mechuras replanted from April 20–22. They continued planting on April 23–25. They planted Fields 4 and 54 with both TS–466 and Asgrow 712 for direct comparison. They got about an inch of rain on April 26 or 27, which again suspended planting. Tommy Mechura said that the Asgrow emerged four or five days before the TS–466 in the same field. The TS–466 had weaker stand, twisted plants, and buggywhip damage. Tommy Mechura said that only the TS–466 had the damage; the Asgrow 712, Conlee Rustler, and TS–488 did not suffer the same damage. Younts, visiting the farm in April, saw chemical damage to the crop. She felt that the problem was with the seed, especially with its vigor, or speed of growth.

On May 14, the Mechuras hosted a meeting of representatives of many of the parties: Ciba–Geigy's Younts and Matt Keating; Crosbyton's president, Nathan Boardman; and Texas Seed's representative Kubecka and president Louis Jupe. They toured some fields and took some samples. At various times during the growing season, some of them returned to view the progress of the crop. The Mechuras finished planting on May 18–19.

Some of the visitors to the Mechuras' farm speculated that the crop damage was caused by a variety of problems, most stemming from the rains. In some fields, they saw no difference between the TS–466 and other varieties; in others, the TS–466 was markedly worse. From ground-level and airborne observation, they saw that many of the damaged areas occurred in parts of fields where water stood or ran across the field. Some areas where water had stood were not ever planted. Standing water in particular could have effectively suffocated the seed. Rain could have caused the Atrazine to leach into the root zone and kill the plants as Cortese said it had in the TDC fields in 1989. Cortese, though he noticed that the Texas Seed had a reduced and shorter stand compared to adjacent varieties which could have been caused in part by inadequate Concep application, said he did not see symptoms of

---

4. The lot number has significance to the seed companies. The 57 is a code for the particular variety. The second 9 indicates when the seed was grown or purchased by the supplier. Thus 579 indicates that this TS–466 was mixed in 1989. The first 9 distinguishes this lot of seed from other lots from this mixture; others begin with 5, 6, 7, and 8. The letters after the numbers indicate the chemical treatment. The A stands for Apron, the C for Concep. The initial A apparently has no significance.

Bicep or Atrazine damage in the Mechuras' fields. Hogs uprooted in some wet areas. Some witnesses noticed scanty stands in every eighth row, indicating a possible planter problem. Dr. Dan Krieg, appellants' expert, speculated that the application of Gammasan could have caused a gummy coating on the seed or planter, plugging the holes, or that the Apron could have reacted with a plastic in the planter and closed the holes. Kubecka said that, when he watched the Mechuras' workers plant in May, he noticed a bolt was missing from one of the eight planter boxes allowing seed to leak through the hole and fall unplanted on top of the ground; he said he stopped the planter and taped the hole. Kubecka also testified that, when he took his samples from the planter hoppers, one hopper was substantially lower than the others. Some witnesses speculated that the rains that interrupted planting and caused replanting created several problems by postponing the onset of the plants' growth cycle. The plants, maturing later than usual in the year, were exposed to insects that do not affect earlier-harvested crops; to hotter growing conditions than earlier-planted crops, causing faster growth and lower yield; and reducing the yields on late-planted crops harvested earlier in their growth cycle than earlier-planted crops.

The Mechuras began harvesting in late July, were interrupted by the rice harvest, and finished in August. They harvested an average yield of 3,775 pounds per acre on fields planted with TS–466. This figure is better than the 10–year Mechura Farms average of 3,668 lbs./acre [5] and better than the 1990 county-wide average of 3,400 lbs./acre.[6] Matagorda County agricultural extension agent James Engbrock stated that he expects that good farmers like the Mechuras would do better than the county average. The TS–466 crop sold for over $400,000. The Mechuras got better average yields on two

other varieties, Asgrow 712 (4,857 lbs./acre) and Conlee Rustler (4,295 lbs./acre).

The Mechuras sued all five links in the seed and chemical chain. Before trial, Ciba–Geigy and Terra settled for $100,000 in damages, $13,483.12 in costs, and $25,000 in credit for Ciba–Geigy products. The case went to the jury on claims for breach of contract, breach of the implied warranty of fitness for a particular purpose, and DTPA violations. The court rejected the Mechuras' proposed instructions and questions and submitted the appellants' instructions and questions, denying all but one of the Mechuras' objections to the charge.

The jury found that the seed was unfit for growing sorghum because of a defect. They also found that the germination rate of the seed was not 85% when the seed was bagged and tested in February 1990. The jury finally found that the seed was not properly treated with Concep II. The jury found that each of these proximately caused the Mechuras damage. The jury found that the Mechuras had no actual knowledge of any disclaimer of warranties on the bag. The jury also found that the chemicals applied to the seed damaged the Mechuras. The jury apportioned fault 10% to the Mechuras, 70% to the trial defendants, 20% to Ciba–Geigy, and 0% to Terra. The jury found that the Mechuras suffered $100,000 in damages. The jury did not consider exemplary damages because it found that none of the defendants acted knowingly. The jury found that the Mechuras had incurred $125,000 for attorneys' fees at trial, and would incur $100,000 for appeal to this court and $100,000 for appeal to the supreme court.

The court reduced the damage award to $70,000 based on the comparative responsibility findings. The court reduced the attorneys' fees awards to $75,000 for trial, $15,000 for appeal to this court, and $5,000 for appeal

---

**5.** The ten-year average is derived from a formula that includes the county average for six fixed "base" years, 1980–1985, and the four previous years of Mechura Farms production. The base figure was 3,528 pounds per acre and the Mechuras' average for 1986–1989 was 3,724. The Mechuras' four years included the "disaster" year of 1987 which produced only 1,344 pounds per acre. The figures for the remaining years—

1986, 3,920 lbs./acre; 1988, 4,368 lbs./acre; and 1989, 5,264 lbs./acre—combine for an average of 4,517 lbs./acre.

**6.** This figure was the estimate of James Engbrock, state agricultural extension agent for Matagorda County. It included nonproductive fields.

to the supreme court. The court ruled that the $70,000 damage award was completely offset by the $137,000 settlement package. The court also ordered that, according to stipulation of the parties, the Mechuras pay Martin, the broker, $9,408 on his counterclaim.

█ The Mechuras complain of the trial court's grant of the appellants' motion for instructed verdict, raising a crosspoint of error for each of the four causes of action on which the court granted the motion. When reviewing a challenge to the granting of a motion for instructed verdict, we determine whether there is any evidence of probative force to raise fact issues on the material questions presented. *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978). We consider the evidence in the light most favorable to the nonmovant and disregard all contrary evidence and inferences. *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983). If we find evidence of probative force conflicting with the verdict, we must reverse and remand for the jury's determination of the issues. *Id.*

By crosspoint of error six, the Mechuras contend that the court erred in granting the instructed verdict against their negligence claims. We apply the test from *Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493 (Tex.1991). The court held that

[i]f the defendant's conduct ... would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. Conversely, if the defendant's conduct ... would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract.

*Id.* at 494. The court used the case of a repairman who contracted to repair a water heater to show a fact pattern supporting both theories. *Id.* (citing *Montgomery Ward & Co. v. Scharrenbeck,* 146 Tex. 153, 204 S.W.2d 508, 510 (1947)). Shortly after the repair, the heater ignited the roof and burned down the house. The court held that he breached the contract by botching the heater, and that he also breached an implied, common-law duty not to injure property in

causing the house to burn down. *DeLanney,* 809 S.W.2d at 494. The court contrasted that situation to the facts before them—a failure to properly place an advertisement in the Yellow Pages. In that case, the failure to place the ad breached duties only under the contract, not under common law. *Id.* at 495.

█ The purported negligent acts in this case—drawing a portion of lot A9759AC from seed subjected to a freeze, drawing a portion of the lot from two-year-old seed, failing to apply a binder/sticker along with the Concep II, failing to obtain germination tests for the lot prior to treating with Concep II, and blending lots of varying and unknown quality—all may state lapses in executing contractual duties. There is no evidence that any of these actions breached a common-law duty. The court correctly granted the instructed verdict. We overrule crosspoint six.

█ By crosspoint of error eight, the Mechuras contend that the court erred in instructing the verdict against their strict liability claim. A strict liability claim in Texas is premised upon section 402A of the Restatement of Torts, 2d. *Nobility Homes of Texas, Inc. v. Shivers,* 557 S.W.2d 77, 79–80 (Tex.1977). That section provides:

A seller of a product in a defective condition unreasonably dangerous to the user is subject to liability for *physical harm caused to the user* if the seller is engaged in the business of selling such a product and it is expected to and does reach the user without substantial change in the condition in which it is sold (emphasis added).

The Mechuras do not allege that anyone was physically harmed by the grain or the chemicals applied to it. Physical harm to the grain is not within the protection of this Restatement section. *See Nobility Homes,* 557 S.W.2d at 79–80. Warranty theories can provide a vehicle for such claims. *See id.* at *80.* The trial court correctly instructed the verdict against this claim. We overrule crosspoint eight.

█ By crosspoint of error five, the Mechuras contend that the court erred in instructing the verdict against their claim for breach of express warranty. The Mechuras

alleged breach of the following express warranties:

(1) by Texas Seed—in writing on the seed bag tag that the seed was 99% pure;

(2) by Martin—(a) that the Concep II-treated seed was merchantable, not defective, and fit for the purpose for which the Mechuras intended to use it; and (b) that the Concep II-treated seed offered greater benefits, qualities, and characteristics than other varieties; and

(3) by Crosbyton, Texas Seed, and Martin—(a) that the seed was properly treated with Concep II, protecting it from the adverse effects of Bicep; and (b) that the seed had an 85% germination rate.

A seller who makes an affirmation of fact or promise to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. TEX.BUS. & COM.CODE ANN. § 2.313(a)(1) (Vernon 1968). A seller also makes an express warranty by giving any description of the goods which is made the basis of the bargain, thus warranting that the goods conform to the description. TEX.BUS. & COM.CODE ANN. § 2.313(a)(2) (Vernon 1968). An affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty. TEX.BUS. & COM.CODE ANN. § 2.313(b) (Vernon 1968). The knowledge of the seller, in conjunction with the buyer's relative ignorance, combine to make the slightest divergence from mere praise into representations of fact, which become effective as a warranty. *Valley Datsun v. Martinez,* 578 S.W.2d 485, 490 (Tex.App.—Corpus Christi 1979, no writ). Express warranties rest on "dickered" aspects of the individual bargain. TEX.BUS. & COM.CODE ANN. § 2.313 (Vernon 1968), Comment 1.

■ In order to recover for breach of an express warranty, a plaintiff must prove that the affirmation or description was made, that it was part of the basis of the bargain, that the buyer relied on the statements, that the goods failed to comply with the affirmation, that the buyer was financially injured, and that the breached affirmation was a proximate cause of the injury. *See General Sup-*

*ply & Equip. Co. v. Phillips,* 490 S.W.2d 913, 917 (Tex.Civ.App.—Tyler 1972, writ ref'd n.r.e.). The depth of the necessary reliance is not great, however; a comment to the section states:

In actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement.

TEX.BUS. & COM.CODE ANN. § 2.313 (Vernon 1968), comment 3.

Whether privity of contract is required is taken on a case-by-case basis. One court held that privity was required to enforce express warranties in cases involving solely economic loss. *Texas Processed Plastics v. Gray Enter., Inc.,* 592 S.W.2d 412, 415 (Tex. Civ.App.—Tyler 1979, no writ). We held, however, that an exterminator who makes a perpetual, freely transferable express written warranty knowing that the exterminated house may be sold extends that warranty to buyers of the house. *National Bugmobiles, Inc. v. Jobi Properties,* 773 S.W.2d 616, 622 (Tex.App.—Corpus Christi 1989, writ denied). Another court allowed a buyer to prevail against a manufacturer for purely economic loss from the breach of an express warranty, even though the buyer purchased the goods from an intermediary, because the manufacturer made the express warranties regarding the goods directly to the buyer. *Clarostat Mfg., Inc. v. Alcor Aviation, Inc.,* 544 S.W.2d 788, 791 (Tex.App.—San Antonio 1976, writ ref'd n.r.e.).

Privity is not necessary as to the representations on the bag tag. As in *National Bugmobiles* and *Clarostat,* there is evidence that Texas Seed knew that Martin was only the middleman in the transaction and that the Mechuras were getting at least some of lot A9759AC. There is evidence that Crosbyton produced the bag tag. The bag tag could constitute an express warranty from all three appellants to the Mechuras if the other elements are present.

No evidence shows that the purity representation was incorrect or injured the Me-

churas. The purity concerns the percentage of pure seed, other crop seeds, inert matter, and weed seeds. There was some question about the source of the seeds combined into this lot, but no evidence indicates that the lot was less than 99% pure. The court correctly granted an instructed verdict on this issue.

There is likewise no evidence that Martin expressly warranted that the Concep II-treated seed was merchantable, not defective, and fit for the purpose for which the Mechuras intended to use it. Nor is there evidence that either Crosbyton, Texas Seed, or Martin expressly warranted that the seed was properly treated with Concep II, protecting it from the adverse effects of Bicep. The informed eye could tell that the seed had been treated with Concep from the "C" in the lot number (see footnote 3 above), but that is no evidence of an express warranty of proper application. The court correctly instructed the verdict on these issues.

■ There is, however, some evidence that Martin represented that the Concep II-treated seed offered greater benefits, qualities, and characteristics than other varieties. Though Tommy Mechura testified that he selected TS–466 half because of his 1989 crop and half because TS–466 was all that Martin had, he also testified that he originally planned to buy four or five different varieties. The jury reasonably could have inferred that Martin's representations about the superiority of TS–466 changed Tommy's mind about ordering five different varieties. The jury could also have found that Martin's comparative representations went beyond opinion or commendation of the goods. Though Tommy may have known he had good results with TS–466, the jury might have found that he relied on Martin's superior knowledge as to its comparative quality. There is some evidence that, in 1990, the TS–466 performed worse than other varieties that the Mechuras planted. There is thus some evidence that Martin's statements, relied on by Tommy Mechura, caused the Mechuras to purchase and plant inferior seed, get inferior yields, and lose money. The

court erred in granting the instructed verdict on this issue.

■ We look finally at the alleged warranty that the seed had a germination rate of 85%. The bag tag, prepared by Crosbyton for Texas Seed and passed through Martin, represented that lot A9759AC, tested in February 1990, had a germination rate of 85%. Though the bag tag was merely a representation that the seed had been tested and had germinated at 85% or higher, evidence casts doubt on that representation. Testimony indicated that no one retested lot A9759AC after its Concep II treatment before sending it to the Mechuras. John Metcalf, the seed law coordinator for the Texas Department of Agriculture, testified that Concep II treatment effectively creates a new lot and that Concep II-treated seed should be retested before being retagged. The first test conducted on lot A9759AC resulted in an 83% germination rate; though there were many other tests conducted, some of which produced rates higher than 85%, such evidence is beyond the scope of our "no evidence" standard of review here. Witnesses agreed that farmers like the Mechuras will not buy seed tagged at less than 85% germination rate. Tommy Mechura said that some of the seed planted had rotted in the ground without germinating, causing a thinner stand, reducing yields. The court erred in granting the instructed verdict on this issue.

We sustain crosspoint five as to alleged express warranties made by Martin regarding the superiority of TS–466 and made by all appellants as to the purported February germination test rate of 85%. We overrule crosspoint five as to all other issues.

■ By crosspoint of error seven, the Mechuras contend that the court erred in granting the instructed verdict against their claims for breach of the implied warranty of merchantability. Unless excluded or modified,[7] the warranty of merchantability is implied in a sale of goods if the seller is a merchant for that type of goods. TEX.BUS. & COM.CODE ANN. § 2.314(a) (Vernon 1968). This warran-

---

7. The jury's unchallenged finding is that the Mechuras had no actual knowledge of any disclaim-
er of warranties by Texas Seed.

ty implies that the goods (1) pass without objection in the trade under the contract description; (2) if fungible, are of fair average quality within the description; (3) are fit for the ordinary purposes of such goods; (4) run, within variations permitted by the agreement, of even kind, quality, and quantity within and among all units; (5) are adequately contained, packaged, and labeled under the agreement; (6) and conform to the promises or affirmations of fact made on the container or label. TEX.BUS. & COM.CODE ANN. § 2.314(b) (Vernon 1968). There is no longer a requirement for privity between the seller and the injured buyer in an implied warranty claim. *Nobility Homes,* 557 S.W.2d at 80–82.

■ There is no dispute of any of the elements other than the fitness of the goods for the ordinary purpose of the goods. Proof of unfitness requires proving a defect. *Plas-Tex, Inc. v. United States Steel Corp.,* 772 S.W.2d 442, 443 (Tex.1989). To have a defect under this claim, the goods must lack something necessary for adequacy. *Id.* Here, there was evidence that some of the TS–466 fields produced damaged plants and skimpy stands right next to another variety that showed no similar problems. The Mechuras introduced evidence indicating that these problems stemmed from seed problems including the age of the seed and freezing, which could crack the seed coat and enable chemicals to damage the seed more easily in moist conditions. There was evidence that the seed was exposed to moist, but not overly moist, conditions. Since the ordinary purpose of the seed included producing a crop in moderately moist conditions, these problems could be considered a defect. There is at least some evidence that these problems constituted a lack of something necessary for adequacy. We sustain crosspoint seven.

■ Having examined the trial court's decisions not to send some causes of action to the jury, we turn to its decisions to send other causes to the jury. The appellants contend by point of error four that the trial court erred by overruling their objections to the charge. The appellants' complaint in their motion for judgment notwithstanding the verdict that the charge did not submit questions on all the issues necessary to sustain the causes of action does not prompt us to review the charge. The rules of procedure provide that

> [f]ailure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment; provided, however, that objection to such failure shall suffice in such respect if the question is one relied upon by the opposing party.

TEX.R.CIV.P. 278. The appellants did not object, either in writing or at the charge conference, to any omissions in the questions asked; if anything, they invited error by submitting deficient questions. The appellants waived objections to any omissions. We overrule point four as it relates to omissions in the charge. The appellants' only objection to the charge made before submission to the jury was that no evidence supported submission of any of the questions; we will deal with that contention in connection with points of error one, two, and three.

■ The appellants attack the legal sufficiency of the evidence to support the judgment by points of error two and three. By point two, they assert that the court erred by failing to grant their motions for instructed verdict on the causes sent to the jury. We may review the denial of the motion for instructed verdict because the court's ruling on the motion was recited in the judgment. *See Soto v. Southern Life & Health Ins. Co.,* 776 S.W.2d 752, 754 (Tex.App.—Corpus Christi 1989, no writ). We review the decision on a "no evidence" standard; we view the evidence in the light most favorable to the nonmovant, rejecting unfavorable evidence and inferences. *See Kelly v. Diocese of Corpus Christi,* 832 S.W.2d 88, 90 (Tex. App.—Corpus Christi 1992, writ dism'd w.o.j.). By point three the appellants attack the denial of the motions for judgment notwithstanding the verdict and to disregard the jury findings with regard to each cause of action. A judgment notwithstanding the verdict is proper only if there is no evidence to support the jury's findings. *Exxon Corp. v. Quinn,* 726 S.W.2d 17, 19 (Tex.1987). In

reviewing the denial of such a motion, we also use a "no evidence" standard with respect to the jury's findings. *Wal–Mart Stores, Inc. v. Berry,* 833 S.W.2d 587, 590 (Tex.App.—Texarkana 1992, writ denied); *see also Navarette v. Temple Indep. Sch. Dist.,* 706 S.W.2d 308, 309 (Tex.1986). If there is some probative evidence supporting the verdict, we must affirm the court's denial of the motion. *See Berry,* 833 S.W.2d at 590.

Our review of the evidentiary basis of the judgment includes both questions asked and questions omitted. The deemed findings must be supported by factually sufficient evidence. TEX.R.CIV.P. 279. As the appellants pointed out, the court's charge omitted elements of each of the Mechuras' surviving causes of action. These omissions and the court's judgment favoring the Mechuras results in the deemed finding of the missing elements. TEX.R.CIV.P. 279.[8] Since actual findings of the omitted items must be supported by factually sufficient evidence, the deemed findings must likewise be supported by factually sufficient evidence. With proper preservation, we can review the legal or factual sufficiency of the evidence to support the deemed findings. *See County of Burleson v. General Elec. Capital Corp.,* 831 S.W.2d 54, 57 (Tex.App.—Houston [14th Dist.] 1992, writ denied).[9]

■ We first review the jury's finding regarding the Mechuras' allegation that the appellants "breached the contract with [the Mechuras] to sell [the Mechuras] seed which would produce grain sorghum." The Mechuras did not allege that they contracted for a particular yield or comparative yield. Question One asked the following:

Was the seed supplied by any of the Defendants unfit for growing a grain sorghum crop because of a defect, and, if so, was such unfit condition a proximate cause of the loss in question?

A "defect" means a condition of the seed that renders it unfit for the growing of a grain sorghum crop.

The jury responded affirmatively.

There is no evidence to support the jury's affirmative answer to Question One. The evidence showed that the TS–466 produced an average of 3,775 lbs./acre, a yield higher than the 1990 county average and higher than the 10–year average for Mechura Farms. In accord with the Mechuras' petition, the question did not ask whether the seed was unfit to produce a *commercial* grain sorghum crop. The Mechuras' disappointment in the comparison of TS–466 to other varieties is no evidence that TS–466 was unfit to grow a grain sorghum crop. There was no evidence that the seed was defective as defined by the instruction. The court erred by overruling the appellants' motion for instructed verdict, their objection that there was no evidence to support submission of Question One, and their motion for judgment notwithstanding the verdict based on this lack of evidence. We sustain points two, three, and four as to Question One and the claim for breach of contract.

The Mechuras also claimed that the appellants breached their implied warranty of fitness for a particular purpose. To prove a claim for breach of this warranty, parties must show that they had a particular purpose for the goods, that the seller knew about that purpose, and that the buyer relied on the seller's skill or judgment to provide suitable

8. The rule provides, in part:
 When a ground of recovery or defense consists of more than one element, if one or more of such elements necessary to sustain such ground of recovery or defense, and necessarily referable thereto are submitted to and found by the jury, and one or more of such elements are omitted from the charge, without request or objection, *and there is factually sufficient evidence to support a finding thereon,* the trial court, at the request of either party, may after notice and hearing and at any time before the judgment is rendered, make and file written findings on such omitted element or elements in support of the judgment. If no such written findings are made,

such omitted element or elements shall be deemed found by the court in such manner as to support the judgment.
TEX.R.CIV.P. 279 (italics ours).

9. The supreme court mentions only review of deemed findings for legal sufficiency. *American Nat'l Petroleum Co. v. Transcontinental Gas Pipe Line Corp.,* 798 S.W.2d 274, 278 (Tex.1990). The explanation for this apparent discrepancy is the limitation of the supreme court's review of evidentiary sufficiency solely to legal sufficiency. *See Ames v. Ames,* 776 S.W.2d 154, 158–59 (Tex. 1989).

goods. Tex.Bus. & Com.Code Ann. § 2.315 (Vernon 1968). The appellants, in their motion for judgment notwithstanding the verdict, contended that Question One lacked all of the elements necessary to prove breach of the warranty.

 Indeed, the Mechuras' claim breaks down on the first two elements. In their petition, the Mechuras alleged the growing of a commercial cash crop of grain sorghum as their particular purpose. A "particular purpose" under the statute must be a use that is peculiar to the buyer's business. *Lanphier Constr. Co. v. Fowco Constr. Co.*, 523 S.W.2d 29, 41 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd n.r.e.). The particular purpose must differ from the ordinary use; a warranty for the ordinary use is covered under the warranty of merchantability in section 2.314. Tex.Bus. & Com.Code Ann. § 2.315, comment 2. The comment provides the example of shoes; though shoes are normally used for walking on ordinary ground, a seller may be aware that the buyer seeks shoes for the particular purpose of climbing mountains. The record reveals no evidence that the Mechuras had an analogous particular purpose for the TS–466. The only jury question related to this issue (Question One) asked if the seed was unfit for growing a grain sorghum crop. Even if we grant that their purpose in buying chemically-treated grain sorghum seed was to produce a commercial cash crop, there was no evidence that such a use is anything other than the ordinary purpose of that seed.[10] Without a particular purpose, there can be no evidence that they communicated any particular purpose to any of the appellants. Because no evidence supports finding these elements, the court erred if it deemed these findings. We sustain points two and three as to the claim for implied warranty of fitness for a particular purpose.

 We turn now to the Mechuras' claim for violations of the Deceptive Trade Practic-es Act. Tex.Bus. & Com.Code Ann. §§ 17.41, *et seq.* (Vernon 1987). The Mechuras alleged that the appellants violated the DTPA by misrepresenting to them that the TS–466 had a germination rate of 85% and that the seed had been properly treated with Concep II prior to shipment.[11] The court asked the jury only these two questions on these allegations:

*Question Two:*

Do you find that the germination rate of the seed at issue was not 85% at the time the seed was bagged and tested in February of 1990, and if so, was this the proximate cause of Plaintiff's damages, if any?

. . . .

*Question Three:*

Do you find that the seed at issue was not properly treated with Concep II, and if so, was this the proximate cause of Plaintiff's damages, if any?

The jury responded that the germination rate was not 85%, that the seed was not properly treated with Concep II, and that both were proximate causes of the Mechuras' damages.

The Mechuras' DTPA claims are based on misrepresentation, however, not deficiency in a performance or product. The only question regarding misrepresentation was Question Seven, which asked whether any misrepresentations were made knowingly; the jury responded negatively. That leaves unasked the more basic question of whether the appellants made any misrepresentation. Because the court found for the Mechuras on their DTPA claims, the court must have deemed the finding of misrepresentations.

The finding of misrepresentation, of course, contains an implicit finding of a representation. We will not disturb that finding here. The appellants did not contend in their motions at trial that they made no representation regarding the proper application of Concep II. Also, contrary to the

10. This is the stuff of which a claim for breach of the implied warranty of merchantability is made; as we held above, the court erroneously instructed a verdict against the Mechuras' claim for that breach.

11. The Mechuras alleged knowing misrepresentation. We do not consider the appellants' knowledge on appeal because of the unchallenged jury finding in Question Seven that the defendants did not knowingly misrepresent the seed's qualities.

appellants' argument, there is clear evidence of a representation of the germination rate—the bag tag. While the bag tag may not have *guaranteed* any germination at all, it definitely represented that the seed, when tested in February 1990, had a germination rate of 85%. Representations in hand, we proceed to examine the evidentiary basis of the deemed finding of the falsity of that statement. This will turn on a review of the jury's answers to Questions Two and Three.

There is some evidence to support both answers. There was extensive testimony that the crop suffered chemical damage from Bicep. There was some evidence that the damage was caused by Dual, the chemical against which Concep II was designed to protect. As we discussed above concerning the express warranty, there is evidence that the appellants misrepresented that TS–466 lot A9759AC had been tested in February 1990 and produced an 85% germination rate. Though the DTPA claim involves a representation rather than a warranty, the evidence that supported the Mechuras' express warranty claim based on the bag tag germination rate also requires that we overrule points two, three, and four as to the DTPA claims for misrepresentations. We must now conduct a review of the factual sufficiency of the evidence on this issue as the appellants urge in point one.

■■■ In reviewing a challenge to the factual sufficiency of the evidence, we look at all of the evidence both favoring and opposing the jury's determination. *Plas–Tex,* 772 S.W.2d at 445. We review the evidence, keeping in mind that it is the jury's role, not ours, to judge the credibility of the evidence, to assign the weight to be given to testimony, and to resolve inconsistencies within or conflicts among the witnesses' testimony. *Corpus Christi Teachers Credit Union v. Hernandez,* 814 S.W.2d 195, 197 (Tex.App.—San Antonio 1991, no writ) (citations omitted). Having done so, we will set aside the verdict only if the evidence standing alone is too weak to support the finding, or the answer is so against the overwhelming weight of the

evidence that it is manifestly unjust and clearly wrong. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

■■■ The jury's response to Question Three is against the great weight of the evidence. The undisputed purpose of Concep II is to protect the seedling from the Dual component of Bicep; the Concep II label specifically states that it is not effective against the triazine component of Bicep.[12] Tommy Mechura said he understood this limit on Concep II's protectiveness. When Concep II is applied separately, it must be applied with a binder/sticker to prevent dusting off. The binder/sticker and the Concep are mixed with water and applied to the seed. Crosbyton then tests a sample for accuracy of application. Texas Tech crop physiology professor Dr. Dan Krieg, the appellants' expert witness, testified that the binder/sticker is designed to prevent Concep II from dusting off while the seed is being handled; it is not designed to prevent the Concep II from washing off as both chemicals are water soluble.

The Mechuras argue that they introduced evidence that Crosbyton did not use a binder/sticker. The following is the exchange with Crosbyton president Boardman underlying that claim:

Q. Now, when you brought the seed lot back in, the 551 bags, and treated it with Concep, did you put anything else on it?

A. Not to my knowledge.

Q. Just Concep?

A. Yes.

Q. Under mixing instructions at the top of the right-hand portion, the second paragraph says "Concep II does not contain a binder sticker. When Concep II is used alone a binder such as Ortho Seed Protectant Binder or Gustafson Phase II Binder will help prevent dusting off." What is dusting off?

A. Well, dusting off would be a dust, a powder, or dust that might come off of seed in this case, I suppose.

---

12. The flow of the testimony indicates that triazine may have been transcribed as Atrazine, or perhaps Atrazine is another name for triazine.

Since this connection is only our speculation, we do not base our decision on any connection.

Q. If the Concep dusted off, it wouldn't be effective, would it?

A. I've never had that problem. I've never had that experience. We've always communicated real close with the chemical folks and apply our chemicals according to the prescribed manner to apply them.

Q. Okay. Did you apply binder sticker?

A. I didn't do it myself. I would assume that Crosbyton Seed Company applies chemicals. I know we apply chemical by the recommendation of the manufacturer.

Q. Did you apply binder sticker?

A. I guess. I mean, I didn't mix up the chemical. We applied chemicals as prescribed by the chemical companies.

Q. Okay, sir. Now, you feel sure that you applied a binder sticker because that was what the label says and you followed the label; is that correct?

A. We try our best to follow the label.

Q. But now you did not treat a sample of the lot and test it for germination prior to treating the lot as the label says to do; is that correct?

A. We had the basis of a lot of tests on this lot of seed.

Boardman never explicitly said whether his company used a binder/sticker, but his statements might be construed to show that Crosbyton did not. The evidence weighs against such construction.

Three separate gas chromatograph tests showed that Crosbyton applied the safener within the acceptable range. Krieg tested a sample of seed Ciba–Geigy's Younts sent him, purportedly gathered from the Mechuras' farm in April. He found the Concep II was applied at 1.1 grams per kilogram—less than the ideal 1.3 g/kg but within the labeled rate of 1.0–1.5 g/kg. The Mechuras challenged the reliability of this test because the sample was not shown to be representative nor was the tested sample explicitly tied to the Mechuras' seed. Krieg also interpreted the graphs of the test run by Gaylon Wheeless for Crosbyton on March 1, 1990, when the seed was treated. Krieg said the graph showed the safener was "just inside of the 1.2;" this reading conformed with the hand-writing on the graph indicating that the level was 1.13.[13] The Mechuras had their own sample sent to a laboratory in February 1991. That test showed Concep II applied at a rate of 1.24 g/kg. These tests indicate that, even a year later, the Concep II had not dusted off the seed.

Testimony conflicted as to whether Concep II, properly applied, could wash off after planting during heavy rains. There was no assertion that the binder/sticker was intended to prevent the Concep II from washing off, only whether water could move fast enough in the soil to be a factor. Texas A & M agronomy and weed science professor emeritus Dr. Morris Merkel, plaintiff's expert, said that washing the safener from the seed is not a major factor in seed injury; he said that, under high soil moisture conditions, plants suffer chemical injury, particularly from Atrazine, even with a safener present. He did not, however, rule out washing off. Krieg opined that the safener could wash away if the soil were saturated, exposing the plant to chemical damage. He said that, based on his understanding of the chronology of the planting and rainfall at the Mechuras' farm, the standing water likely diluted the Concep and caused a chemical problem for the March and late April plantings. Cortese said he had never heard of such dilution and consequent injury occurring.

Cortese also testified regarding the difficulties TDC had in 1989 with a Texas Seed variety. He said that seed's problem was caused by an irregular application of herbicide and Concep. Cortese said that Krieg's gas chromatograph test showed that Concep was applied to TDC's seed that year at approximately half the recommended level. That differs from this case in which the chromatographs showed the Concep application well within the recommended range.

There was evidence that the TS–466 suffered chemical damage that other adjacent varieties did not experience; even Boardman agreed that the TS–466 stand was thinner in Field 54, though he considered the stand adequate. There was evidence that the Asgrow 712 in Field 54 was planted a day

13. Neither Krieg's testimony nor the handwriting express the units of measure.

earlier than the TS–466, and that the TS–466 was rained on very soon after it was planted. Witnesses also testified that the Asgrow in Field 54 was planted on land slightly higher than the TS–466. Visitors noted that the land over the TS–466 was smoothed and had accumulations of field debris; the witnesses said that these characteristics indicate that water ran over or sat on these areas. In Field 66, Younts estimated that the Texas Seed had a 50% loss in stand compared to the adjacent Conlee. She noted that the Texas Seed had a better stand in that field on the one planter strip that had no Bicep on it. Kubecka felt that the Texas Seed had more chemical damage and about a 30% thinner stand than the Asgrow. On the other hand, Boardman and Jupe saw no difference between the TS–466 and the Asgrow in Field 4. Boardman considered the TS–466 stand in Field 20 beautiful and the biggest on the farm.

There was evidence that the TS–466 had less vigor than the other varieties. Vigor is important in areas treated with herbicide, however, because the longer the seedling takes to emerge, the longer it is exposed to the herbicides. Concep slows germination. Slower germination and less vigor means more exposure to the herbicides. Reduced vigor is not, however, probative of inadequate Concep application.

The harm attributable to any chemical damage is not clear when we look at the harvest, however. Witnesses testified that individual sorghum plants will produce more to compensate for a weak stand. The TS–466 performed at least comparably in fields where it was planted next to other varieties. According to the Mechuras' weight tickets, the TS–466 outdid the adjacent Conlee by 170 lbs./acre on Field 66. The TS–466 produced either 600 lbs./acre less than the adjacent Asgrow in Field 4, or it may have outproduced it by as much as 1,800 lbs./acre, depending on which variety the loads in some disputed weight tickets were.

The results in Field 54 were similar. Wide variations within varieties were the rule, with yields on TS–466 ranging from less than 3,000 lbs./acre on some fields to over 6,000 lbs./acre on others. Conlee Rustler produced the lowest single-field yield (Field 70: 2,545 lbs./acre) on a field surrounded by trees that sapped moisture and inhibited crop dusting. Over the entire farm, as shown above, the TS–466 produced less than both the Conlee Rustler and the Asgrow.

The evidence that the Concep II stayed on the seed in acceptable levels above the ground is uncontroverted. The evidence is clear that this is all that a binder/sticker is designed to do; it is not designed to stay on in very wet conditions. The probativeness of the evidence of chemical damage of uncertain origin pales in comparison to the three uncontroverted test results—particularly the test conducted for the Mechuras. We find the evidence that the Concep II was misapplied too weak in comparison to support the jury's answer to Question Three. We sustain point one on this issue. This decision erases the implied finding of misrepresentation of proper application.

■ We turn now to review the germination representation. We must conduct this review within the context of the agricultural regulations that require the germination tests. The Mechuras introduced a pamphlet of Texas seed law rules and regulations. The pamphlet states that the purpose of the seed law is

> [t]o make it possible for farmers to buy planting seed which can be relied upon to give favorable returns on seed investment by utilizing information on the tag or label so that they may decide whether the stock is the best obtainable for the money....

The statute requires the seed bag label to list information including the variety, lot number, germination rate, and date of the germination test of the seed. TEX.AGRIC.CODE ANN. § 61.004(a) (Vernon 1982). The statute requires that all seed be tested within nine months immediately prior to being sold or offered, exposed, or transported for sale. TEX.AGRIC.CODE ANN. § 61.009 (Vernon 1982). The regulation defines a lot as "a definite quantity of seed identified by a lot number or other mark, every portion or bag of which is uniform within recognized tolerances for the factors which appear in the labeling."

Texas Department of Agriculture seed rules coordinator Metcalf testified that a seed producer is entitled to tag seed at its maximum germination test rate; if the producer receives nineteen tests of under 85% germination and one test of above 85% germination, the producer may tag the seed as having 85% germination. Some variation in test results is expected. The regulations allow up to a 7% variance when investigating an apparent violation of the labeling laws. This margin of tolerance cannot be used to tag higher than the maximum result received; it merely indicates the expected variance in results.

Crosbyton president Boardman testified that his company blended seed from two sources to create the mixture from which lot A9759AC was drawn. One of these source lots had a germination rate of 94% and the other had a rate of 87%. Boardman said Crosbyton combined two parts of the former and one part of the latter to create the mixture; he opined that this produced a lot with 91% germination, though no test was performed. The Mechuras introduced evidence that a third source of unknown germination rate was involved. This dispute does not affect our examination of the germination representation because the tests of the source lots and projected rate of the mixture do not provide the statutorily mandated test of lot A9759AC; the blending of sources creates a new lot that had to be and was tested.

Crosbyton divided the mixture into five lots, all treated with Apron: lots A5759A, A6759A, A7759A, A8759A, and A9759A. Crosbyton treated the first lot with Concep II, then sent samples of all five to Armadillo Seed Laboratories. While waiting for the results, Crosbyton shipped lot A9759A to Texas Seed. The tests showed the following results on February 26, 1990: A5759AC— 85%; A6759A—87%; A7759A—86%; A8759A—85%; and A9759A—88%. Texas Seed then returned lot A9759A for treatment with Concep II. Crosbyton treated the seed, then drew a sample and sent it off to Armadillo. Crosbyton did not test the seed before returning it to Texas Seed. The regulations do not specifically require a lot to be retested

after treatment, but Metcalf opined that treatment with Concep II creates a new lot, requiring a new test. This conclusion has basis in agricultural science, since chemical treatment might reduce the germination rate. Crosbyton's Boardman opined that his company was under no duty to test anew because it no longer owned the seeds at treatment and thus could not be offering them for sale. On his investigation of the apparent violation of the seed tag laws, Metcalf accepted the February test of A9759A to substantiate the tag based on his understanding that the seeds were not sold or offered for sale after their treatment with Concep II. He thus found no violation of the seed laws by Texas Seed.

The first test of the Concep II-treated lot A9759AC reported an 83% germination rate in March 1990. Crosbyton did not produce this result to TDA because of later test result on a sample from the same lot. Armadillo reported in April 1990 an 89% germination rate on lot A9759AC.

The Mechuras meanwhile were dissatisfied with the progress of the March planting of TS–466. Tommy Mechura reported some weak stands of sorghum, some sickly plants, some unemerged but germinated seeds, and some seeds rotted in the ground ungerminated. The Mechuras replanted and continued planting in April before again being stopped by rain. In May, Texas Seed representative Kubecka gathered some samples of seeds from the Mechuras' barn; there was a dispute over the source with Kubecka and Ronnie Mechura stating that Kubecka got them from open and unopened bags, and Tommy Mechura testifying that no unopened bags remained by then. Kubecka sent one sample to a TDA lab and another to Armadillo. Also in May, Kubecka, Jupe, Keating, Younts, and Boardman came to the Mechuras' farm. All noticed reduced stands of TS–466 in the fields Tommy Mechura showed them. They all noticed signs of chemical damage. In June, Tommy Mechura took some samples from opened bags of Asgrow 712, Conlee Rustler, and TS–466, and sent them into a TDA lab for testing. The bags were filled with seed left over from planting, some of which had sat in the Mechuras' planter boxes

between plantings. The bags were on the dirt floor in a ventilated, but not climate-controlled, barn.

The Mechuras' sample showed an 78% germination rate in July. The TDA lab reported an 82% rate on Kubecka's sample in July and an 83% rate in October. Armadillo showed an 82% rate in July.

The 78% rate prompted a seed complaint investigation by TDA. Inspector Bill Taylor went out in July to perform a plant count and make a report. He found 116,160 plants per acre. The Mechuras suggested several ways that his plant count might have been inaccurate if he counted "sucker" heads rather than actual plants, but said they had not watched him and did not articulate any basis for knowing that Taylor did not know how to do a plant count. Using the midpoints of the number of seeds per pound of TS–466 (13,000–14,000) and the Mechuras' planting rate of (9–10) pounds per acre, Texas Seed calculated that the Mechuras planted 128,250 plants per acre. The plant population count then shows that 91% of the seeds not only germinated, but emerged and survived until at least a week before harvest.[14] Under this method, the minimum average germination rate was 83%, while the maximum was 99%.

In August, Texas Seed found some bags of A9759AC in Martin's barn. Jupe could not testify as to the storage conditions at Martin's, but said that the bag appeared weathered. Texas Seed requested that TDA pull a sample from these bags; Jupe said that Metcalf told him that had he known that Texas Seed had not controlled the bags' storage conditions from March through August, he would not have pulled the samples. TDA ran four tests on this sample: August 13, 68%; August 28, 46% germination; September 7, 68% germination; and September 10, 61% germination. The August 13 test prompted an apparent violation report, a stop-sale order, and a TDA investigation.

Evidence was introduced regarding the deleterious effects of heat and humidity on the germination rate of seed, sharply limiting the probative value of tests of seed stored in adverse conditions to the germination rate in February. A table prepared by Dr. C. Hunter Andrews of Mississippi State University showed the effects of storing seeds at 30 degrees Celsius (86 degrees Fahrenheit) and 75% relative humidity, conditions equalled or exceeded in Matagorda County in 1990. The table showed the germination rates over time of seeds with many different chemical treatments; we will look only at untreated seed and seed with Apron and Concep II:

| Chemicals | 0 wks | 4 wks | 8 wks | 12 wks | 16 wks |
|---|---|---|---|---|---|
| none | 95.5% | 92.0% | 91.0% | 72.0% | 40.0% |
| Apron, Concep II | 87.5% | 85.0% | 74.5% | 61.5% | 24.0% |

The applicability of these data to our seed is not perfect. The seed tested was not TS–466, nor did any of the samples have Captan and Nugro, other chemicals. The temperature and humidity were apparently held constant, unlike the fluctuations found outside the laboratory.

On the other hand, the temperature and humidity in the tests never exceeded the stated levels as they did in Matagorda County. In May, the high temperature at the nearby Bay City Agricultural Experiment Station was 88 degrees and the high relative humidity was 90%; May had only 3 days when the average humidity fell below 75%.

The average temperature was 77 degrees and the average humidity was 81%. In June the high was below 90 degrees only four days, and the high relative humidity never fell below 75%. The average temperature was 83 degrees and the average humidity was 74%. In July, the high temperature was over 85 all but three days, and the high relative humidity fell below 90% only twice. The average temperature was 81 degrees and the average humidity was 77%.

As further testament to the durability of the original mixture from which A9759AC was drawn, when kept in favorable storage conditions, Texas Seed introduced the Janu-

14. Texas Seed's calculations for some reason show 128,500 seeds per acre and a corresponding germination rate of 90%, erring in favor of the Mechuras' contention of lower germination rate.

ary 1992 test results of lot A8759A. After two years of storage, the lot produced an 88% germination rate. By contrast, however, a January 1991 test of lot A5759AC which had been subjected to unknown storage conditions showed only 49% germination.

At first glance, this broad array of germination test results appears to have given the jury room to conclude virtually anything about the germination rate. Closer examination reveals that the great weight and preponderance of the evidence opposes the jury's finding.

The germination rates of samples drawn any time after May provide next to no evidence of the lot's germination rate in February. The testimony that exposure of seed to heat and humidity devastates its germination rate stands uncontroverted. Comparison of the tests of Kubecka's samples, drawn in May (82%, 82%, and 83%), the test of Tommy Mechura's samples, drawn in June (78%), and the samples drawn from Martin's extra bags, drawn in August (46%, 68%, and 61%), substantiates that testimony.[15] Comparison of the test results of Kubecka's samples with the April germination test result of 89% further substantiates that testimony; the April test sample had not been exposed to the increasingly adverse conditions Kubecka's samples had endured, even in early May. The effect of the elements on the test results narrows considerably the field of probative evidence that could enter the deliberations of reasonable jurors.

The interplay of the regulatory scheme and the test results is key. The seed company is entitled to label at the highest germination test result it receives on a particular lot. Clearly, the appellants did not have any test result of lot A9759AC at the time it was shipped to the Mechuras following its treatment with Concep II. Yet, Metcalf, TDA's seed law coordinator, accepted the February pre-treatment test result of 88% to extinguish his inquiry into the apparent violation. In March, the treated seed produced an 83% rate, but in April produced an 89% rate. Witnesses repeatedly testified that such fluctuations were normal and expected. Undisputed testimony showed that a lot need produce only one test result exceeding 85% to be tagged as 85%. TDA inspector Taylor's plant count showed an even more striking result: 91% of the seeds not only germinated, but emerged, and survived. There was ample evidence of patches where lot A9759AC was vastly less successful. The plant count, however, while not conducted under ideal, controlled conditions of a laboratory germination test, bolsters significantly the April test result.

While the April test result and the plant count do not satisfy the regulatory requirement that the bag tag represent a pre-sale germination test rate, they do wholly undermine the jury's answer to Question Two. That court asked the jury whether the germination rate was not 85% at the time the seed was bagged and tested in February 1990.[16] The question presents, not a question of technical compliance with the regulation, but of substantive comportment with the representation. Viewed against a regulatory scheme that allows a single sufficient test result to erase countless insufficient results, the April test result and the plant count provide overwhelming evidence that the germination rate was 85% in February at the time of the representation. We find that the great weight of the evidence is against the jury's answer to Question Two.[17] We sustain point one on this issue.

■ By crosspoint one, the Mechuras complain that the court erred by granting judgment to Martin on his counterclaim for $9,408 in the absence of a jury question

---

**15.** The 88% germination test rate of lot A8759A in 1992 lends some further support to the theory in general, but its application to the rate of lot A9759AC is limited because the lot A8759A was not treated with Concep.

**16.** We note that the question assumes that lot A9759AC was tested in February 1990. We have established that it was not. We cannot pass on the propriety of the question since neither party

raises it as error. We therefore concentrate on the correctness of the germination rate in February 1990, which is the real focus of the question.

**17.** The undermining of the jury's answer to Question Two necessarily also eviscerates any implied finding that a misrepresentation that the seed had tested at 85% in February harmed the Mechuras.

specifically pertaining to the issue. Martin had counterclaimed for the amount the Mechuras had not paid for the seed. Under cross-examination, Tommy Mechura admitted that the Mechuras still owed Martin "around $9,400" for the seed, but had no intention of paying for the seed until they reached agreement on what caused the problem. The only damage issue that the court submitted was Question Six:

> What sum of money, if any, if paid now in cash, would reasonably and fairly compensate Plaintiff for its damages, if any, caused by defective seed.
>
> Do not include any monetary loss resulting in damage to the crop, if any, caused by chemicals, excess moisture, adverse weather condition, insects or anything that does not result from the seed itself.
>
> Do not include any monetary loss resulting from the Plaintiff's failure to mitigate his damage.

The jury found $100,000 in damages. While there is no damage issue specifically pertaining to the $9,408, Question Six provides ample latitude for the jury to deduct that amount from the damages awarded to the Mechuras on other issues. Martin's counsel, in his closing argument, encouraged the jury to use this latitude, saying:

> [Tommy Mechura] said that he owed Jimmy Martin $9,400 for the seed. He's not paid him. And he said that would be okay if you people allow him to collect that, *deduct it from the damages* that Jimmy, he wants Jimmy to pay one of which is for payment of the seed.

(italics ours). The latitude in the question cuts both ways. Because the jury could have factored the unpaid amounts in their finding under the only damage question, the court's award of $9,408 separate from the jury's award was erroneous. It allowed Martin to recover twice, once through reduced damages and once through outright recovery. The issue's implicit inclusion in the damage question, however, prevents a rendition against the claim on the grounds urged by the Mechuras—failure to submit a question. We therefore sustain crosspoint one in part by reversing the award, but overrule it in part by remanding rather than rendering.

The Mechuras' remaining crosspoints deal with issues rendered moot by our decisions. Crosspoint nine attacks the court's award of dollar-for-dollar credit against the settlement, while crosspoints ten through twelve attack the denial of pre- and post-judgment interest on the jury's award. Discussions of offset are moot because we have reversed all of the bases for the trial court's award of damages. Crosspoints two through four question the propriety of the court's offset of the $9,408 against the attorneys' fees award to the prevailing party under the DTPA, while crosspoint fifteen attacks the ordered remittitur of the attorneys' fee award; our reversal of the DTPA recovery necessarily reverses the attorneys' fee award. Crosspoints thirteen and fourteen attack the denial of costs to the Mechuras as the prevailing party; again, under our ruling, the Mechuras have not prevailed. The parties may face these issues again should the Mechuras prevail on remand, but the issues are not necessary to the disposition of the appeal. TEX. R.APP.P. 90(a). We will not offer an advisory opinion.

We affirm the judgment against the claims for negligence, strict liability, and breach of express warranties that the seed was 99% pure, merchantable, not defective, properly treated with Concep II, and fit for the purpose for which the Mechuras intended to use it.

We reverse and render judgment against the Mechuras' claims for breach of contract, breach of the implied warranty of fitness for a particular purpose, and for violation of the DTPA by misrepresenting that the seed was properly treated with Concep II.

We reverse and remand for new trial on the Mechuras' claims for express warranties by Martin in extolling the superiority of TS–466 and by all appellants in representing on the bag tag that lot A9759AC had been tested in February 1990 and produced a germination rate of at least 85%. We also reverse and remand for new trial on the Mechuras' claims for violation of the implied warranty of merchantability. We reverse and remand the Mechuras' claims for violation of the DTPA by misrepresenting the germination

rate of the seed and by misrepresenting that the Concep II was applied correctly. We also reverse and remand for new trial as to Martin's claim for $9,408 on the sale of seed.

BENAVIDES, J., not participating.