824 So.2d 396 (2002)
ARCADIAN CORPORATION, et al.,
v.
OLIN CORPORATION, et al. (Industrial Risk Insurers and Reliance National Insurance Company).
No. 01-1060.
Court of Appeal of Louisiana, Third Circuit.
May 8, 2002.
Rehearing Denied June 19, 2002.
*397 Caleb H. Didriksen, III, Didriksen Law Firm, New Orleans, LA, for Lloyds, London, and AssicurazioniGenerali, S.p.A., Lexington Insurance Company.
Thomas M. Bergstedt, Bergstedt & Mount, Lake Charles, LA, Annette Natalie Peltier, Bergstedt & Mount, Lake Charles, LA, Joel K. Goldman, Bruce Moothart, Husch & Eppenberger, Kansas City, MO, for Defendant/Appellee Olin Corporation.
Huntington Blair Downer, Jr., Houma, LA, for Insurance Company of North America.
R. Joshua Koch, Jr., Spyridon, Koch & Palermo, Metairie, LA, James R. Sutterfield, Hoffman, Sutterfield, et al, New Orleans, LA, Stephen T. Perkins, Cavalier Telephone, LLC, Richmond, VA, Ralph D. McBride, Ileana M. Blanco, Bracewell & Patterson, Richard Sanders, Houston, TX, *398 for Arcadian Partners, L.P., Arcadian Corporation, Arcadian Fertilizer, L.P.
Joseph J. Lowenthal, Jr., Stewart Earl Niles, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre LLP, New Orleans, LA, for Schoeller-Bleckmann Gesellschaftm.b.H.
Dermot S. McGlinchey, Colvin Gamble Norwood Jr., McGlinchey, Stafford, PLLC, New Orleans, LA, for Stamicarbon NV and DSM NV.
Terrence Charles McRea, Zelle, Hofmann, etc., Dallas, TX, for Plaintiff/Appellant Gan Minster Ins. Co., Ltd., Phoenix Assurance Co., Zurich Insurance Co., Starr Technical Risks Agency of Texas, Assurances Generales de France IART, Fireman's Fund Insurance Co., Riunione, Adriatica Di Sicurta, Industrial Risk Insurers/RelianceNational Ins. Co., Commonwealth Ins. Co., The Home Ins. Co.
Court composed of JOHN D. SAUNDERS, OSWALD A. DECUIR, and GLENN B. GREMILLION, Judges.
GLENN B. GREMILLION, Judge.
The plaintiffs, Industrial Risk Insurers and Reliance National Insurance Company (Industrial Risk), appeal the jury's verdict finding no liability on the part of the defendant, Olin Corporation, with regard to the sale and subsequent failure of a urea reactor at Arcadian Corporation's chemical plant in Westlake, Louisiana. For the following reasons, we affirm.

FACTS
This suit is the last of many arising from the catastrophic failure of a urea reactor owned by Arcadian. In 1966, Olin began producing urea fertilizer at its complex in Westlake. On August 17, 1989, Olin sold its ammonia and urea plants to Fertilizer Acquisition Company III(FAC), Arcadian's predecessor in interest.[1]
Included as an asset in the Asset Purchase Agreement was a multi-layer, high pressure vessel known as the R-2 reactor. The reactor, which was approximately ninety feet tall and six feet in diameter, was comprised of a stainless steel liner surrounded by fourteen layers of carbon steel. It was constructed in four twenty-foot sections joined together by five girth welds, which were designated C-1, C-3, C-5, C-7, and C-9. Each section consisted of a one-half inch stainless steel inner layer, surrounded by a dummy layer of carbon steel, and then thirteen additional layers of carbon steel. Heads were welded on at the top and bottom of the vessel. Inside the vessel, eight sieve trays were attached to the vessel liner via welded tray clips. The trays were divided into three sections. The two outer sections were connected to the liner, while the inner section or the "man-way" section was capable of being removed so that inspections or repairs could be carried out inside the reactor. Each tray attached to the vessel by ten tray clips welded to the liner wall.
The vessel also contained a leak detection system which was designed to alert personnel in case a girth or liner weld failed. The system consisted of twentyfour holes drilled through the fourteen layers of carbon steel up to the space between the dummy layer and the stainless steel liner. Stainless steel tubing screwed into the weep hole also terminated at this space. Eighteen weep holes and tubes were located in pairs of three above and below the girth welds, one hundred and twenty degrees apart, at C-3, C-5, and C-7, *399 and three were located above C-1 and below C-9, for a total of twenty-four weep holes.
Olin produced urea fertilizer through a process designed by Stamicarbon BV, a Dutch company. The process required the injection of gaseous carbon dioxide, liquid ammonia, and carbamate[2] into the bottom of the reactor at 3,000 pounds of pressure at 374°F, which formed ammonium carbamate and then urea and water with the addition of heat. Since ammonium carbamate is very corrosive to carbon steel, the stainless steel liner prevented it from reaching the carbon steel layers. Although stainless steel is less susceptible than carbon steel to corrosion, it still corrodes upon contact with ammonium carbamate. However, Stamicarbon patented a process called passivation through which air is injected into the reactor along with the carbon dioxide, which causes oxygen to bath the walls of the reactor forming a layer of chromium or nickel oxide. As long as oxygen is continuously injected into the vessel, the chromium or nickel oxide layer will form to protect the stainless steel layer from corrosion.
Prior to FAC's purchase, Olin mothballed the urea plant for approximately one year, beginning in July 1987. It reactivated the plant in May 1988, under the direction of Baldwin Fruge. Approximately one month later, Dana Baham, an engineer with Olin, became the superintendent of the urea plant. On June 23, 1989, a leak occurred in the reactor at C-5, as evidenced by a twenty-foot stream of a brownish looking mixture of gas and liquid spewing out of a leak detection tube at 5. The reactor was shut down and Schoeller Bleckmann was hired to inspect it. Once the thickness of the liner was measured, Schoeller-Bleckmann determined that the liner was capable of being repaired. Olin carried out the repairs using plans provided by Schoeller-Bleckmann and its own welders. Johann Pesak, a welding inspector for Schoeller-Bleckmann, supervised the welding.
The repairs consisted of grinding down and replacing all of the girth and longitudinal liner welds, removing all of the tray clips and grinding down the welds attaching them to the liner wall, and performing dye penetrate tests to locate cracks and thinned areas of the liner. Once these areas were located, patches of the stainless steel liner were affected at C-3, C-5, and C-7, and all eighty tray clips were rewelded to the liner wall using a full penetration weld. It was important that there be no voids or crevices in the welds because process fluid could enter the weld through a void, taking it out of the reach of passivation and allowing corrosion to proceed. The final report by Schoeller-Bleckmann stated that the next inspection of the reactor should be made after one year at the latest.
On August 17, 1989, FAC purchased Olin's ammonia and urea plants via the Asset Purchase Agreement. In this agreement,[3] Olin expressly warrantied that:
[T]he Assets have been properly maintained and are in satisfactory operating condition (except for ordinary wear and tear which in the aggregate would not have an adverse effect on the Business) and are capable of being used in the Business without present need for repair or replacement except in the ordinary course of business and consistent with prior practice.
*400 The Asset Purchase Agreement further provided:
The representations and warranties set forth in this Agreement and the other documents, instruments and agreements contemplated hereby shall survive the Closing. The representations and warranties of Olin herein and in the documents and instruments to be delivered by Olin as contemplated hereby, other than those relating to title to or encumbrances affecting the Assets and Environmental and Liabilities (as defined below) shall survive for a period of thirty-six months after Closing[.]
As was customary in the industry, Olin personnel operating the urea plant transferred along with the plant to FAC, and Baham continued as the urea plant superintendent. In January 1991, Baham conducted an inspection of the liner during a turnaround in which both the urea and ammonia plants were shut down. This involved entering the reactor and conducting a seam by seam inspection of the same areas inspected by Pesak in 1989. Readings taken with a permascope showed virtually no change in the thickness of the liner between 1989 and 1991. No other testing or repairs were made to the reactor.
On January 3, 1992, an operator discovered a blob of hard carbamate material on the end of a weep hole located at C-7, and saw dried material inside the weep hole. Dick Richardson, the C-operator, reported the finding to the A-operator, who reported it to Baham. Baham had the operators inject steam into the weep holes to verify that they were clear and told them to keep a close watch over them. He reported the incident to his superior, Ernie Elsbury. Since there were no further indications of a leak, they decided to continue operating the reactor under close observation. Baham did not feel that this was a leak, rather, he believed that the presence of the blob was an extrusion of urea which was caused by the thermal cycling of the vessel of urea located in it prior to that time or at the time of the 1989 leak.
On the night of June 14, 1992, Baham was informed that a clear liquid was leaking out a weep hole located at C-5. The leaking consisted of a clear drop forming every three to four minutes on the end of the leak detection tube. After reviewing the records of the 1989 repair, he concluded that the leak was coming through a fillet weld into the annulus between the filler patch and the overlay patch. Based on his findings, Baham had the operators steam out the two leak detection tubes monitoring the same annulus and watch them carefully. He knew that, as long as the path between the weep holes was clear, there was atmospheric pressure present and that carbamate could not exist at atmospheric pressure. This leaking continued for forty-four days. Plans were underway for an unplanned outage in July or August 1992, in order to effect a repair of the reactor.
On July 28, 1992, the R-2 reactor failed catastrophically when it ruptured at C-7. The top part of the reactor, from C-7 up, had blown up and the head of the reactor was found 200 feet south of the reactor, driven into the ground. The top twenty-five percent was found over a quarter of a mile away, while other parts were found between 1200 to 1700 feet from the reactor. The remainder of the reactor, from C-7 down, had driven itself and the concrete pedestal upon which it sat forty feet into the ground. The stainless steel liner was found approximately 650 feet from the liner, crumpled up in one piece.
As a result of this incident, Arcadian was required to terminate its production of ammonia and urea. It was further required to settle numerous claims for personal *401 and property damage and to pay penalties issued by the Occupational Safety and Health Administration. On July 28, 1998, Arcadian, individually and on behalf of its insurers, including Industrial Risk, filed suit against Olin and other defendants, including Schoeller-Bleckmann and Stamicarbon. In its petition, Arcadian alleged that Olin was liable to it based on a breach of its implied and express warranties and based on negligence. Reliance National later intervened in the suit arguing that it was subrogated to Arcadian's claims against Olin for claims to damage to property. Although this suit was consolidated with many others, those suits have been compromised. The only remaining matter concerns the subrogation claims of Industrial Risk and Reliance National against Olin.
Following a twelve day jury trial, the jury rendered a verdict finding that Olin did not breach its contract with Arcadian based on a breach of warranty and that it was not at fault in causing the July 28, 1992 rupture. The jury further found that Arcadian was at fault in causing the accident and that its fault was the intervening sole cause of the reactor failure. A judgment was rendered in favor of Olin and against Industrial Risk on December 4, 2000. This appeal by Industrial Risk followed.

ISSUES
Industrial Risk raises two assignments of error on appeal. First, it argues that the jury erred in finding that Olin did not breach its express warranty that the urea rector would be in satisfactory operating condition for thirty-six months. Next, it agues that the jury erred in finding that Arcadian's negligence was the "intervening sole cause of the reactor failure."

STANDARD OF REVIEW
In Lasyone v. Kansas City Southern Railroad, 00-2628, pp. 5-6 (La.4/3/01), 786 So.2d 682, 688, the supreme court reiterated the appellate standard of review:
A trial court's finding of fact may not be reversed absent manifest error or unless clearly wrong. Stobart v. State of Louisiana, Through Department of Transportation and Development, 92-1328 (La.4/12/93), 617 So.2d 880. The reviewing court must do more than just simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart, 617 So.2d at 882. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Id. The reviewing court must always keep in mind that "if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Stobart, 617 So.2d at 882-83, citing Housley v. Cerise, 579 So.2d 973 (La.1991) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).

JURY INSTRUCTIONS AND INTERROGATORIES
In its second assignment of error, Industrial Risk argues that the trial court erred by instructing the jury on intervening cause and including an interrogatory pertaining to intervening cause on the verdict sheet. It claims that the issue of intervening cause was not applicable to the facts of this case, that the jury instructions *402 and interrogatory used confusing, undefined legal terms, and that they were an incomplete and incorrect statement of the law. We disagree.
Industrial Risk complains about three jury charges proposed by Olin and used by the trial court in its jury instructions. The jury charges are as follows:
Olin's Suggested Jury Charge No. 7:
The proximate cause of an injury is the primary or moving cause, or that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the accident could not have happened, if the injury be one which might be reasonably anticipated or foreseen as a natural consequence of the wrongful act. Liability for negligence attaches to all injurious consequences that flow therefrom until diverted by intervention of some efficient cause that makes the injury its own, or until the force set in motion by the negligent act has so far spent itself as to be too small for the law's notice.
Olin's Suggested Jury Charge No. 8:
Negligence is the proximate cause of an injury where the negligence process is an unbroken chain, without independent intervening cause up to the point of inflicting injury or damage. That is the legal technical definition of proximate cause. What the definition means is this: the law takes no cognizance of negligence which is remote to the accident or the injury. It is only the negligence which actively and directly causes the accident or the injury which the Court recognizes and attaches legal consequences to.
Olin Suggested Jury Charge No. 9:
When the first actor is negligent, but a second actor's negligent conduct intervenes between the first actor's negligent act and the resulting wrong, the negligence attributable to the first actor may be come (sic) a passive cause, too remote in point of time or sequence to events to remain viable in legal contemplation.
The jury interrogatory complained of stated, "Was negligence on the part of Arcadian Corporation the intervening sole cause of the urea reactor failure?"
In Lee v. Automotive Casualty Insurance Co., 96-517, p. 3 (La.App. 3 Cir. 11/6/96), 682 So.2d 995, 997, writ denied, 96-2949 (La.1/31/97), 687 So.2d 409, we stated:
Jury instructions are adequate if they fairly and reasonably point up the issues and provide correct principles of law for the jury to apply to those issues. Kaplan v. Missouri-Pacific Railroad Co., 409 So.2d 298 (La.App. 3 Cir.1981). "An appellate court must exercise great restraint before overturning a jury verdict on the suggestion that the instructions were so erroneous as to be prejudicial." Doyle [v. Picadilly Cafeterias], 576 So.2d [1143] at 1152. This manifest error standard of review may not be ignored unless the proposed jury instructions are so incorrect or inadequate as to preclude the jury from reaching a verdict based on the law and the facts. Lewis v. Wal-Mart Stores, Inc., 546 So.2d 267 (La.App. 3 Cir.1989).
Industrial Risk's main argument stems from its claim that the facts of this matter only raise issues of concurrent and comparative fault and that the complained of principles containing information pertaining to intervening causes sufficient to relieve a party of its negligence are inapplicable. We disagree with this argument. Whether Arcadian's negligence was an intervening cause of its own damages was an issue before the jury; thus, the jury charges pertaining to intervening cause were properly included in the trial court's *403 instructions to the jury. Included in those instructions was a charge proposed by Industrial Risk. That charge stated, "You are instructed that a negligent party may be relieved of liability by the intervening actions of another party only if that intervening action was the sole cause of the injured party's injury and the negligent party could not have foreseen that the injury might occur as a result of its negligence." Thus, Industrial Risk had, itself, placed the issue of sole intervening cause before the jury.
In Griffin v. International Insurance Co., 98-431, pp. 7-8 (La.App. 3 Cir. 10/7/98), 727 So.2d 485, 490, we found the following instruction pertaining to intervening cause sufficient:
When an accident results from two acts of negligence, one more remote and one occurring later, the presence of the latter cause prevents the finding of liability on one responsible for the more remote cause. The subsequent action of the other persons or entities can constitute intervening acts of negligence which supersede negligent acts of an original tortfeasor.
Reading the jury instructions as a whole, we find that they fairly and reasonably point up the issues raised by the evidence presented to the jury, and that they provided the correct principles of law such that the jury could reach a verdict based on the law and the facts before it. Nor do we find that the jury interrogatory is confusing or misleading. It also fairly and adequately pointed out the issue of intervening cause, which was before the jury, and allowed the jury to reach a verdict based on the facts and the law in particular matter. Accordingly, we dismiss this assignment of error as being without merit.

PROXIMATE CAUSE
Since we find that both of Industrial Risk's assignments of error turn on the issue of proximate cause, we will address this issue next. In Perkins v. Entergy Corp., 00-1372, pp. 7-10 (La.3/23/01), 782 So.2d 606, 611-13, the supreme court discussed cause-in-fact and the substantial factor test of the duty/risk analysis:
Generally, the initial determination in the duty/risk analysis is cause-in-fact. Boykin, 707 So.2d at 1230. Cause-in-fact usually is a "but for" inquiry, which tests whether the accident would or would not have happened but for the defendant's substandard conduct. Id. Where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident. Id. at n. 10; Jones v. Hawkins, 98-1259, 98-1288, p. 7 (La.3/19/99), 731 So.2d 216, 220; Rick v. State, Dept. of Transp. and Development, 93[-]1776, 93-1784, p. 8 (La.1/14/94), 630 So.2d 1271, 1275; Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962). To satisfy the substantial factor test, the plaintiff must prove by a preponderance of the evidence that the defendant's conduct was a substantial factor bringing about the complained of harm. Dabog v. Deris, 625 So.2d 492, 493 (La.1993).
This court has made several different inquiries when applying the substantial factor test. For example, the court has stated that when there are multiple causes, clearly cause-in-fact exists when the plaintiff's harm would not have occurred absent the specific defendant's conduct. Graves v. Page, 96-2201, p. 9 (La.11/7/97), 703 So.2d 566, 570. The court has also applied the substantial factor test by asking whether each of the multiple causes played so important a role in producing the result that responsibility *404 should be imposed upon each item of conduct, even if it cannot be said definitively that the harm would not have occurred "but for" each individual cause. See id. (citing Trahan v. State, Department of Transportation & Development, 536 So.2d 1269, 1272 (La.App. 3 Cir.1988)). See also Frank L. Maraist & Thomas C. Galligan, Louisiana Tort Law, § 4-3 at 86-88 (1996) (noting that the substantial factor test operates well in cases where there are multiple possible causes-in-fact, but the trial judge or jury may not be able to conclude that the accident most likely would not have happened but for any one of the causes). Additionally, in LeJeune v. Allstate Ins. Co., 365 So.2d 471, 475 (La.1978), the court, in describing the substantial factor test, stated that "one must consider whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm."
Whether the defendant's conduct was a substantial factor in bringing about the harm, and, thus, a cause-in-fact of the injuries, is a factual question to be determined by the factfinder. Theriot v. Lasseigne, 93-2661, p. 5 (La.7/5/94), 640 So.2d 1305, 1310 (citing Cay v. State DOTD, 93-0887 (La.1/14/94), 631 So.2d 393 (La.1994)). A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Id. (citing Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990)). In order to reverse a trial court's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993). Further, on review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221. In sum:
[T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.

Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973); Ambrose, 639 So.2d at 224, n. 1 (Lemmon, J., concurring)
However, while deference must be given to the factfinder's determinations, this court clarified in Ambrose that our purpose in Stobart was not "to mandate that the trial court's factual determinations cannot ever, or harldy (sic) ever, be upset." Ambrose, 639 So.2d at 221. Recognizing that great deference should be accorded to the factfinder, the court of appeal and this court have a constitutional duty to review facts. Id. To perform its constitutional duty properly, an appellate court must determine whether the trial court's conclusions were clearly wrong based on the evidence or clearly without evidentiary support. Id.

*405 If there is more than one cause of the accident, the initial tortfeasor will not be relieved of the consequences of his negligent actions unless an intervening cause superceded the original negligence and alone produced the accident. Domingue v. State Dep't of Public Safety, 490 So.2d 772 (La.App. 3 Cir.1986). Even if there is an intervening cause, the original tortfeasor will not be relieved of liability if he could or should have reasonably foreseen that the accident would have happened as a result of his negligence. Id.

EVIDENCE
During this twelve day trial, the parties presented evidence in the form of testimony from numerous witnesses and experts and introduced over 250 exhibits. After a thorough review of this evidence, we find that the jury was presented with two definite views of the evidence.
The first view, propounded by Industrial Risk, indicated that Olin breached the express warranty found in the Asset Purchase Agreement, that the R 2 reactor was capable of being used without the "need for repair or replacement except in the ordinary course of business and consistent with prior practice" for a period of thirty-six months. In support of its breach of warranty and negligence claims, Industrial Risk presented evidence establishing that the welds connecting the sieve trays to the wall of the liner were improperly welded by Olin welders. The evidence presented revealed that Schoeller-Bleckmann directed that the tray clip be attached to the liner with full penetration welds. However, testing of the tray clip welds after the reactor failure revealed that every one contained a void contrary to the Schoeller-Bleckmann directive. Industrial Risk presented evidence establishing that process fluid reached the carbon steel layers through a void in a tray clip weld located at C-7, where, out of the presence of passivation, it eroded the stainless steel liner and the carbon steel layers surrounding it until there were insufficient layers of carbon steel to contain the pressure of the reaction process causing the reactor to rupture. Evidence was presented showing that, based on the defective tray clips, the reactor was not in satisfactory operating condition at the time of the 1989 sale.
Industrial Risk also introduced evidence establishing that Olin received information from Stamicarbon in 1982, pertaining to the propensity of the reactor's leak detection system to become blocked due to carbamate or crystalized urea, and its recommendations for an improved leak detection system. It presented evidence to prove that Olin knew of this information, that it failed to pass it on to Arcadian at the time of its purchase and that this information would have prevented the reactor failure.
The second view of the evidence was presented by Olin and pertained to the negligence of Arcadian in failing to shut down the reactor, even though there were indications of a leak in the reactor. The evidence revealed that the leak detection tubes were clear at the time Olin sold the reactor to Arcadian, but that no further testing was done to establish their condition during the 1991 shutdown. It also presented evidence establishing that the leak detection tubes at C-7 were recovered and found to be plugged with iron carbamate, and that the leaking at C-5 was due to blockage of the C-7 leak detection tubes and the communication of product down to that location.
Olin produced evidence establishing several mistaken assumptions made on the part of Baham. First, when the blob of urea was discovered at the C-7 leak detection tube, he decided not to shut down the reactor on January 3, 1992, because he *406 believed that it was an extrusion of urea caused by the thermal cycling of the vessel of urea located in it prior to that time or at the time of the 1989 leak. Next, after the leak at C-5 was discovered on June 14th, Baham decided not to shut down the reactor because he believed that the filler patch applied at that location during the 1989 repair was attached with a full penetration weld, before the overlay patch was applied. In reality, the filler patch was tack welded to the liner. Baham also thought that the leak detection tubes installed at C-5 during the 1989 repair ended in the space between the filler patch and the cover patch. This led him to believe that the material was coming through a fillet weld into the annulus between those two patches and then out through the leak detection system. Instead, the leak detection tubes at this location terminated at the space between the dummy layer and the stainless steel liner, as did all of the other tubes.
The evidence further established that Baham believed that, as long as the material was clear, the leak was contained to the stainless steel liner and did not involve the carbon steel layers. Had corrosion occurred there, then he felt that the liquid would have turned a reddish or rusty color. Baham also believed that, as long as he was able to inject steam into the leak detection tubes, he would dissolve any material located there and would have a clear path between them at which atmospheric pressure was present and at which carbamate could not exist. Also, as long as he had a clear path, he knew that he was at atmospheric pressure. Olin introduced evidence proving that the C-7 leak detection tubes were plugged with iron carbamate, which is insoluble and unaffected by steam. Baham further assumed that there could be no communication between leak detection tubes located at C-7 and those located at C-5 while the reactor was pressurized. Finally, Baham did not believe that this was a leak which would require the reactor to be shut down, because it did not resemble the 1989 leak, in which liquid spewed from the C-5 leak detection tube.
Olin also introduced evidence establishing that Arcadian planned to repair the reactor during an unplanned outage in June or July 1992, but that the outage was delayed while it waited for a softening in the urea market. Finally, it introduced evidence that Stamicarbon recommended the immediate shut down of a reactor upon the discovery of a leak or in the case of a possible or suspected leak. There was also evidence that this was the standard operating procedure in the industry.
Since the jury was presented with two differing views of the evidence, and because causation is a question of fact to be decided by the factfinder, we cannot say that the jury erred in finding that the actions of Arcadian, through Baham, in failing to shut down the reactor, even in the face of forty-four days of leaking, were an intervening cause superseding the negligence of Olin in failing to properly supervise the welding of the repairs to the reactor. It was not foreseeable that a plant superintendent would ignore a leak of forty-four days without shutting down the reactor. In affirming the jury's finding that Olin's actions were not a proximate cause of the reactor failure, we must also affirm its finding that Olin did not breach its express warranty to Arcadian, since proximate cause is an element of a breach of an express warranty. Crosbyton Seed Co. v. Mechura Farms, 875 S.W.2d 353 (Tex.Ct.App.1994). Accordingly, the judgment of the trial court in favor of Olin and against Industrial Risk is affirmed.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. The costs of *407 this appeal are assessed equally between the defendant-appellants, Industrial Risk Insurers and Reliance National Insurance Company.
AFFIRMED.
SAUNDERS, J., dissents and assigns reasons.
SAUNDERS, J., dissenting.
Finding no manifest error, the majority affirms the ruling of the trial court. Because I find that the trial judge erred in instructing the jury, I would reverse and remand.
Jury instruction numbers 7,8, and 9 all pertain to intervening superceding cause. For example, jury instruction number 7 reads, in part: "Liability for negligence attaches to all injurious consequences that flow therefrom until diverted by intervention of some efficient cause that makes the injury its own, or until the force set in motion by the negligent act has so far spent itself as to be too small for the law's notice." As I read these instructions, they all deal with a rather obscure legal concept which I will hereafter refer to as "faded negligence" (i.e. over time ones negligence becomes inconsequential).
All the cases cited as authority for these instructions were decided prior to the adoption of comparative negligence. Upon reading these cases, it becomes apparent that the language cited is very fact specific and was mainly used as an equitable solution to the harsh realities of contributory negligence. For example, the Defendant cites Harvey v. Great American Indem. Co., 110 So.2d 595 (La.App. 2 Cir.1958) as authority for jury instruction number 7. In Harvey, the court was asked to determine the liability for an automobile accident where a trailer truck hit a car from behind. The driver claimed he hit the car because of slippery conditions due to highway construction. In determining that the proximate cause of the accident was the truck driver's failure to maintain a safe distance from the car, the court noted the existence of intervening causes. At the time Harvey was decided, Louisiana law did not recognize comparative fault and therefore the court was required to "pick" between a slippery road and a driver following too close as the proximate cause. It is my opinion that, if this case were presented today, a comparative fault analysis would be the appropriate way to handle it.
The language in instruction number 9 is taken from Reeves v. Louisiana & Arkansas Railway Company et al., 282 So.2d 503 (La.1973). As already noted, this case was decided prior to the adoption of comparative fault. The language cited in the jury instruction concerns intervening cause and the remoteness of the first actor's negligence. In reality, Reeves is a case involving the last clear chance doctrine. The last clear chance doctrine was an equitable remedy designed to alleviate some of the harsh realities of the law of contributory negligence. Because this area of the law has since changed, I find that this "faded negligence" analysis would no longer be appropriate for this case. If this case was decided today, the analysis would more appropriately be one of comparative negligence.
Much like Harvey and Reeves, the underlying legal principal (contributory negligence) used in deciding the cases cited as authority for jury instructions number 7,8, and 9, is no longer applicable. I seriously question whether there is such a concept as negligence whose consequence is "too small for the law's notice." If such a concept does exist, it is not what we are dealing with in the present case. In the present case, the top of the reactor was found driven into the ground as much as a *408 quarter of a mile away and the bottom half to the reactor had driven itself and the concrete pedestal upon which it sat approximately 40 feet into the ground. Surely damage of this magnitude cannot be said to be too small for the law's notice.
The record indicates that Olin clearly failed to insure that the reactor was repaired properly in June of 1989. Due to Olin's defective repair, the reactor started to leak. Under current Louisiana law, when the original tortfeaser could or should reasonably foresee the accident may occur, he is liable not withstanding the acts of the second tortfeaser. Dominque v. State Dept. of Public Safety, 490 So.2d 772 (La.App. 3 Cir.1986). Moreover, to be an intervening superceding cause, the act must alone produce the injury. Id.
On June 23, 1989, Olin discovered a leak in the reactor. The reactor was subsequently shut down and inspected by Schoeller-Blackman who determined that it was repairable. Olin performed the needed repairs. However, the record indicates that some of the welds needed to properly repair the reactor were flawed. The record further shows that Olin's flawed welds contributed to the ultimate failure of the reactor. It seems clear to me that, due to the volatile nature of the reactor, it was reasonably foreseeable that the failure to properly weld or repair this reactor would result in an accident.
Moreover, I note that these substandard repairs were performed only weeks before the August 17, 1989 sale of the plant. It seems clear that Arcadian relied on Olin's assertions that the reactor was in good repair, when purchasing the plant and making its operating decisions. Thus, it cannot be said that any negligence by Arcadian relieves Olin of liability for its negligent acts.
A result similar to the one I would reach was found in Miller v. Louisiana Gas Service Company, 601 So.2d 700 (La.App. 5 Cir.1992). In Miller, injuries occurred as a result of a gas explosion while installing a new gas main. Years prior to the explosion, Louisiana Power and Light Company sold its gas main to United Gas who subsequently sold some of its gas line to Louisiana Gas Service Company. At the time of the sale, LP & L turned over a map of all its gas lines, but the map inadvertently omitted the Oliver main. Because neither United Gas nor LGSC was aware of the Oliver line, it was left off of their maps. Approximately thirty years after the sale by LP & L, LGSC began work on parts of the gas line. Because LGSC was unaware of the Oliver line, an explosion occurred during the repair process. The court reasoned that the mere passage of great periods of time is not sufficient to cut-off liability. Finding LP & L to be partially at fault, the court held that LGSC's failure to discover the error and correct it does not relieve LP & L of liability for the initial error. I note that this case involves far less negligence and a much greater passage of time but the negligence was not "too small for the law's notice."
Following the logic used in Miller, any analysis of the concept of "faded negligence" is inappropriate for this case. The record shows that the negligent acts by Olin occurred merely weeks prior to the sale of the plant. Additionally, like LGSC, Arcadian's failure to discover the negligent acts by the original tortfeaser, Olin, should not condemn it to bear the full responsibility for damage caused by their combined negligence.
For the reasons stated, I find that the trial court erred in allowing jury instructions that were not applicable to this case. These instructions were in direct conflict with the legislative mandate of Civil Code article 2323 that "... the degree or percentage *409 of fault of all persons causing or contributing to the injury, death, or loss shall be determined...." Thus, I must respectfully dissent from the majority's finding in this case.
NOTES
[1] Late in 1989, FAC merged into Fertilizer Acquisition Company II and then changed its name to Arcadian.
[2] Carbamate is a condensate of ammonia, carbon dioxide, and water.
[3] The Asset Purchase Agreement was a Texas contract.